NEW YORK AND BOSTON DESPATCH EXPRESS COMPANY & others *vs.* TRADERS' AND MECHANICS' INSURANCE COMPANY.

Suffolk.   Jan. 11. — March 3, 1882.   LORD, FIELD & C. ALLEN, JJ., absent.

A steamboat, on which were goods insured against "immediate loss by fire," came into collision with another steamboat. A fire caused by the collision at once broke out, and the vessel subsequently sank, with the goods insured, before they were touched by the fire. *Held*, that, if the damage to the goods could have been avoided but for the intervention of the fire, the fire was the immediate cause of the loss, and an action on the policy of insurance could be maintained.

CONTRACT upon a policy of insurance, by which the defendant insured the plaintiffs for one year from August 8, 1879,

" against all such immediate loss or damage as may occur by fire " to merchandise on board either of the steamboats of the Providence and Stonington Steamship Company. At the trial in the Superior Court, before *Rockwell*, J., the plaintiffs offered to prove the following facts :

On the night of June 11, 1880, the steamboat Narragansett, belonging to the Providence and Stonington Steamship Company, came into collision with the steamboat Stonington on Long Island Sound, about three fourths of a mile southwest of Long Sand Shoal. There were at that time upon the main deck of the Narragansett three crates or small cars, each mounted upon four iron wheels for their easier handling. These crates, containing goods and merchandise, the property of the plaintiffs, for the damage to which this suit is brought, were carried down and sunk in the water with the steamboat, and were subsequently raised and removed, and delivered to the plaintiffs unopened. The contents were found to be injured by water, but had not been actually touched by fire.

When the vessels came into collision, the stem of the Stonington penetrated the side of the Narragansett on her starboard bow, and aft of her starboard gangway, in close proximity to her coal-bunkers and fire-room. With the collision, fire instantaneously broke out on the Narragansett in the engine-room. It spread rapidly, and within eight minutes raged with such violence as to drive the engineer, the fireman and all their assistants from the engine-room and fire-room. The officers and crew, on account of the fire, were obliged to abandon their duties, and were wholly engaged in getting out and lowering the small boats to save the lives of themselves and the passengers, of whom there were a great number on board. The machinery continued after the collision to do its work until it was stopped by the engineer. The wheels were uninjured, and the engines and the entire running apparatus were unaffected by the collision, excepting that a hole was pierced in the bottom of the starboard boiler, which would not have prevented, however, the successful use of that boiler for some considerable time. There were two boilers capable of being disconnected, either of which would drive the vessel.

The Narragansett was furnished with pumping apparatus, which, if it could have been used, would have cleared the steamboat of water at the rate of fourteen hundred gallons per minute.   This apparatus was in good order, but any use thereof was prevented by the fire.   One pump, however, was used in putting out the fire that first broke out, and substantially got it under in less than one minute, when a fire immediately afterward broke out on the other side of the engine-room.   The other two pumps were connected with the main engine, and could be used only when it was in motion.   Its working was stopped by the engineer, under the belief that its running would tear the wheels to pieces.

The Narragansett lay afloat and burning for half an hour or upwards after the collision.   Practically, the steamboat was burned off to the flooring above the main deck.   During this time she lay motionless, slowly filling, without a drop of water being pumped out of her, on account of the fire, and finally she sank in from four to five fathoms of water.

There would have been no loss of life, and no loss of the cargo or freight, had it not been for the fire, which drove from their posts all those whose duty it was to run the steamboat, thereby preventing any use of the bilge and other pumps for clearing the vessel of water, as well as any use of the machinery for guiding or controlling the conduct and course of the steamboat, or the adoption of any expedients whatever for closing the gap or hole in the side of the steamer.

There were three independent ways in which the safety of the plaintiff's property would have been secured: First. Even if nothing was done to stop the leak caused by the collision, the Narragansett might, within the time that she actually floated after the collision, had it not been for the fire, have been run upon Long Sand Shoal, and grounded in nine feet of water on a good, firm, sandy bottom, leaving her main deck high and dry seven or eight feet above the water.   This shoal was only three fourths of a mile distant from where the Narragansett sank, was five miles long and one quarter of a mile in width, and had a government light vessel and fog signal station at a point equally distant from the two ends of the shoal.   The Narragansett had a broad, flat bottom nearly forty feet wide.   She drew

ten feet of water, and her main deck stood eight feet above the water line. Second. Had it not been for the fire, the hole in the side of the Narragansett might have been stopped by throwing canvas heavily weighted over the side, which would have been sucked into the space and been held there by the pressure of the outside water, as has been repeatedly and successfully done under similar circumstances. Planks properly lowered would be pressed against such a gap in the ship's side, with such force as to furnish great protection against incoming water. With this hole stopped, even partially, and the pumps at work, she would have floated till towed into port, had her own motive power failed. Third. The Narragansett was a side-wheel steamboat, such as are ordinarily used for lake and river navigation. The steamboat City of New York, similar in construction to the Narragansett, was in the vicinity at the time of the collision. The steamboat Stonington, a steamer of the same line and belonging to the same owners as the Narragansett, and which was also similar in construction to the Narragansett, was substantially uninjured by the collision. These two steamboats remained as close at hand as the fire would permit, and rendered what assistance they could. Had it not been for the raging fire, either or both of these steamboats might have laid alongside of the Narragansett, whether the hole caused by the collision were stopped or not; and, with the vessel in that condition, the passengers and these crates would have been transferred to them and saved, without loss or damage. These crates were so placed on the main deck, that, to have saved any of the other freight on the Narragansett, they must have been taken off first. They went on last and came off first, by an invariable custom. They were on the centre of the main deck, directly in front of both of the forward gangways, with nothing between them and the gangways. The steamboats City of New York and Stonington were lightly loaded on that night, and had plenty of room to receive said passengers and freight. They were willing and able to do it.

A special agent of the plaintiff was on board the Narragansett, and it was his sole duty to go every night with these crates, see them on and off the boat, and do anything requisite for their safety. On that night the sea was quiet and smooth,

and the night was calm.   At the time of the collision there was a fog prevailing on the Sound, which remained until the boat sank.

The judge ruled, against the plaintiffs' objection, that the action could not be sustained on these facts, if proved, directed a verdict for the defendant, and reported the case for the determination of this court.

*J. P. Treadwell & E. P. Usher*, for the plaintiffs.

*B. F. Butler*, (*J. W. Fox* with him,) for the defendant.

ENDICOTT, J.    There is no question that the defendant would be liable on its contract of insurance, if the fire was the cause of the loss of the plaintiffs' goods.   It is fairly to be inferred from the report, that the collision was the cause of the fire; and fire caused by collision is not within the exceptions of the policy.

In order to entitle a party to recover on a policy insuring his goods against loss by fire, it is not necessary that the goods themselves should be injured or consumed by the fire.   The insurer is liable for all losses which result from the fire, and can be fairly attributed to it.   If the property is injured by water used to put out the fire, it is within the protection of the policy.   *Lewis* v. *Springfield Ins. Co.* 10 Gray, 159.   *City Ins. Co.* v. *Corlies*, 21 Wend. 367.   *Case* v. *Hartford Ins. Co.* 13 Ill. 676.   *Witherell* v. *Maine Ins. Co.* 49 Maine, 200.   *White* v. *Republic Ins. Co.* 57 Maine, 91.   So if it is submerged in water by the sinking of a ship, and this is caused by the fire, it is equally covered, although not burned.

The case finds that the steamboat, having on board the plaintiffs' goods, was injured by a collision with another vessel.   A fire immediately broke out.   The vessel was provided with pumps and apparatus for putting out the fire and for pumping out the hold; and one pump was at once put in operation, and had extinguished the fire, when a fire broke out in another place and prevented its further use.   The plaintiffs offered to prove that there would have been no loss of their goods except for the fire, which rendered it impossible to run the engine, extinguish the fire, or pump out the water flowing in through the breach caused by the collision; that, for the same reason, it was impossible to take any measures to stop the leak, or

to conduct or guide the vessel to shoal water, which was near at hand; or to enable other vessels in the immediate neighborhood to render assistance, either by keeping the vessel afloat or by removing her cargo. The crew were obliged to abandon her. She remained floating and burning, in substantially the same place, for half an hour after the collision, and sank in four or five fathoms of water, carrying down the plaintiffs' goods, which were not burned. The plaintiffs offered to prove at the trial that there were several ways in which their property could have been saved, which are set forth in the report. No question is made as to the competency of the evidence; and the presiding judge ruled that upon these facts, if proved, the plaintiffs could not recover. We must therefore treat them as facts established.

The defendant contends that the plaintiffs' goods were injured by the sinking of the ship, and, as the water which flowed through the hole made by the collision caused her to sink, therefore the collision, and not the fire, caused the loss. Undoubtedly the injury occasioned by the collision would have caused the vessel to sink, and thereby have injured the plaintiffs' property; and if that had been the only cause operating, the plaintiffs cannot recover, for the insurance is not against collision, but only against fire. But if means and appliances were at hand by which that result could have been avoided, and the intervention of a new agency, namely, that of fire, prevented their use, then the fire was the proximate and immediate cause of the loss. It added a new element of destruction, which rendered it impossible to control or prevent the consequences which would naturally follow from the collision.

In *Metallic Compression Casting Co.* v. *Fitchburg Railroad,* 109 Mass. 277, the defendant's servants ran a train over a hose through which water was being conveyed to extinguish a fire in the plaintiff's buildings; and thereby the water was cut off from the fire, which then consumed the buildings. It was contended, that no direct or immediate injury was done to the plaintiff by the act of the defendant; but that the injury was occasioned by the fire directly, and by the defendant remotely. But it was held that the severing of the hose was the proximate cause of the destruction of the building. Numerous cases are

cited by the court in support of its conclusion, where the question of proximate cause was considered.

The case of *Atkinson* v. *Newcastle & Gateshead Waterworks Co.* L. R. 6 Ex. 404, closely resembles the case last cited. By the defendant's negligence the plaintiff was unable to obtain a supply of water to extinguish a fire on his premises, and it was said by Baron Bramwell: " It has been suggested that this was not the proximate cause of damage; but to my mind clearly that is not so. The plaintiff's right is to have the pipes charged for the purpose of extinguishing fire; and he has alleged that, in consequence of these pipes not being so charged, he could not extinguish the fire, and his house was burnt down. It appears to me that we have here the immediate consequence of a proximate cause."

So far as the question what constitutes proximate cause is concerned, the same considerations apply equally in actions of contract as in actions of tort.

In *Marsden* v. *City & County Assurance Co.* L. R. 1 C. P. 232, by a policy of insurance, plate-glass in the plaintiff's shop-front was insured against " loss or damage originating from any cause whatsoever, except fire, breakage during removal, alteration or repair of premises," none of the glass being " horizontally placed or movable." A fire broke out on premises adjoining those of the plaintiff, and slightly damaged the rear of his shop, but did not approach that part where the plate-glass was. Whilst the plaintiff was removing his stock and furniture to a place of safety, a mob attracted by the fire tore down the store shutters and broke the windows, for the purpose of plunder; and it was held that the proximate cause of the damage was the lawless act of the mob, and that it did not originate from fire or breakage during removal, within the exception in the policy.

In *Ionides* v. *Universal Ins. Co.* 14 C. B. (N. S.) 259, goods were insured by a policy which contained the following warranty: " Warranted free from capture, seizure and detention, and all the consequences thereof, or of any attempt thereat, and free from all consequences of hostilities, riots or commotions." The ship and cargo were lost by stranding, occasioned by the removal by the Confederate troops, during the war of the

Rebellion, of a light on the coast of North Carolina, for the purpose of misleading United States ships. And it was held that, the proximate cause of the loss being a peril of the sea, and not the hostile act of the Confederate troops in extinguishing the light, the insurer was liable as for a partial loss of that part of the cargo which remained on board incapable of being saved; but as to that portion actually saved, or which would have been saved but for the seizure by the Confederate troops, this was a loss by "the consequence of hostilities" within the warranty, and for this the insurer was not liable.

In *Insurance Co.* v. *Transportation Co.* 12 Wall. 194, the vessel of the defendant in error was injured by a collision, in consequence of which she filled rapidly with water, and a fire broke out. The jury found that the damage done by the sinking of the vessel was the natural result of the fire only. It was also found that the water would not have caused the vessel to sink below her promenade deck, had not some other cause of sinking supervened. Mr. Justice Strong, in a very able opinion, considers the question of proximate cause. And in answer to the claim of the plaintiff in error, that the sinking of the vessel was the result of two concurrent causes, one the fire, and the other the water let in by the breach made by the collision, he says : "As the influx of the water was the direct and necessary consequence of the collision, it is argued that the collision was the predominating, and therefore the proximate, cause of the loss. The argument overlooks the fact, distinctly found, that the damage resulting from the sinking of the vessel was the natural and necessary result of the fire only. If it be said that this was but an inference from facts previously found, it was not for that reason necessarily a mere legal conclusion. But we need not rely upon this. Apart from that finding, the other findings, unquestionably of facts, show that neither the collision nor the presence of water in the steamer's hold was the predominating efficient cause of her going to the bottom. That result required the agency of the fire. It is found that the water would not have caused the vessel to sink below her promenade deck, had not some some other cause of sinking supervened. It would have expended its force at that point.

The effects of the fire were necessary to give it additional effi-·ciency. The fire was, therefore, the efficient predominating cause, as well as nearest in time to the catastrophe, which not only directly contributed to all the damage done, after the steamer had sunk to her promenade deck, but enlarged the destructive power of the water, and rendered certain the submergence of the vessel." See also *St. John* v. *American Ins. Co.* 1 Kernan, 516; *Peters* v. *Warren Ins. Co.* 14 Pet. 99.

No peculiar force is to be attached to the word "immediate" as used in the policy, wherein the plaintiffs are insured "against all such immediate loss or damage as may occur by fire to the property."

We are of opinion that it was for the jury to decide, upon all the circumstances of the case, what was the proximate cause of the loss sustained by the plaintiffs, and whether it was the result of the fire. *Milwaukee & St. Paul Railroad* v. *Kellogg*, 94 U. S. 469.                *New trial ordered.*