ALICE A. RUSSELL v. GERMAN FIRE INSURANCE COMPANY.[1]

April 5, 1907.

Nos. 15,010—(182).

**Insurance—Fall of Adjacent Wall—Proximate Cause.**

Respondent's three-story building, thirty nine feet high, was insured in appellant company from loss or damage by fire. Fire consumed the interior of an adjacent five-story brick building, leaving an unsupported brick wall standing, sixty nine feet high and one hundred and seventy five feet long. Seven days thereafter a strong wind arose, during which time the wall fell upon respondent's building, causing damages, to recover which this action was brought. *Held:*

1. That the words, "and in no case to include loss or damage by cyclone, tornado, or windstorm," in a "lightning clause," attached as a rider to the policy, are limited to the rider, and do not apply to or vary the contract as contained in the policy.

2. The evidence is sufficient to justify the finding that the wind was one liable to occur during any month in any season of the year.

3. It is not necessarily the last link in the chain of events which constitutes proximate cause, but that which is the procuring, efficient, and predominant cause; that from which the effect might be expected to follow, without the concurrence of any unforeseen circumstances.

4. If, under all the circumstances, the parties to the contract of insurance could have reasonably foreseen that a fire might leave the adjacent wall unsupported, subject to the action of such wind, and that it might be blown over and fall upon the insured building, such contingency was an element in the risk.

5. Under the evidence in this case the cause of the damage was a question of fact, and the evidence sustains the finding of the trial court that the fire, and not the wind, was the proximate cause.

Action in the district court for Hennepin county to recover upon a fire insurance policy. The case was tried before Holt, J., who found in favor of the plaintiff for $1,673.01. From an order denying a motion for a new trial, defendant appealed. Affirmed.

*Kerr & Fowler,* for appellant.

*Belden, Jamison & Shearer* and *W. R. Cray,* for respondent.

[1]Reported in 111 N. W. 400.

LEWIS, J.

Appellant issued to respondent its policy of the standard form, insuring against loss or damage by fire to a three-story and basement brick, gravel-roof, store, office, and flat building, situated on South Fifth street, Minneapolis, known as the "Russell Block," with a frontage on Fifth street of fifty six feet, and a total depth of forty feet, and thirty nine feet high. Immediately adjoining, on the northwestern side, was the Peck Building, with a frontage of about fifty feet on Fifth street, a depth of one hundred fifty seven feet, and about sixty nine feet in height, consisting of five stories. Northwesterly of the Peck Building, and extending in a northeasterly direction from Fifth to Fourth streets, was a twelve-foot alley, on the northwesterly side of which, and upon the corner of Fifth street and First Avenue South stood the Boutelle Building, having a frontage of about one hundred and fifty seven feet on First avenue, and something over one hundred feet on Fifth street. This building was also five stories high, and connected with the Peck Building upon the second and third stories by runways which extended over the twelve-foot alley between the two buildings. December 13, 1904, a fire broke out in the Boutelle Building, was communicated to the Peck Building, entirely destroyed their interior and contents, but left standing portions of the Boutelle Building. The fire smouldered in the ruins of the Peck Building for four or five days, occasionally breaking into flames, until it was finally extinguished. During the night of December 20 a strong wind blew from a northeasterly direction, during which time, at about the hour of one o'clock in the morning of that day, the south wall of the Peck Building fell and crushed in the roof of the Russell Block.

The question involved is whether, under the terms of the policy, the fire was the cause of the injury. The velocity of the wind on the night of December 13 has a very important bearing on the case. It was shown by the record of the United States weather bureau office at Minneapolis that at 12:15 a. m., December 20, 1904, the wind was blowing at a maximum rate of thirty six miles an hour from the west; from 12:15 to 12:30 a. m., forty six miles; from 12:30 to 12:45 a. m., fifty four miles, apparently from the west and northwest; from 12:45 to 1 a. m., fifty four miles from the west. January 18, 1904, the wind reached a maximum velocity of fifty miles an hour from the west; in

March, 1904, forty eight miles north, and on another day forty two miles from the north; in April of the same year, forty miles from the northwest, and forty five miles from the north; June 23, forty eight miles from the south; July 13, forty five miles from the west; August 20, eighty four miles from the northwest during a tornado; September 5, forty miles from the east; October 9, forty miles from the south; October 19, and also 21, forty two miles from the north; November 9, forty miles from the west; December 20, forty eight miles from the northwest, and on the 27th and 28th, forty six miles from the northwest. A witness in charge of the weather bureau testified that a wind which blew forty miles an hour was called a "gale." It was shown that the observations above referred to were taken from the tower of the Guaranty Loan Building at a height of about one hundred and seventy five feet from the ground; but whether the difference in altitude between the Peck Building and the place of observation made any difference in the velocity does not appear, and we will assume there was no material difference in the effect of such a wind. The windstorm was general throughout that portion of the city, but did not result in general damage to chimneys, etc., in the neighborhood of the Peck Building. On this point we are satisfied that the evidence was sufficient to sustain the court's finding that a strong wind was blowing at the time the wall fell, but that it was not of greater velocity than was likely to occur in that vicinity in any month or season of the year.

There was direct conflict in the evidence as to the condition of the wall as affected by the fire. The first story was a twenty two-inch wall; the second and third stories seventeen-inch walls; and the fourth and fifth stories were twelve-inch walls. The city building inspector, and his assistant, and several contractors and builders, examined all the walls immediately after the fire, and generally agreed that the south wall of the Peck Building was in good condition, straight and plumb, and practically uninjured by the fire. They testified that some of the walls of the Boutelle Building were taken down, and others propped up, but that the south wall of the Peck Building was not touched, for the reason that it was considered safe; that it was carefully examined as to the condition of the brick and cracks, but that nothing important affecting the strength of the wall was discovered. On the other hand, one of respondent's witnesses testified that he observed on

the inside of the wall a crack running diagonally from the rear end towards one of the windows, but it does not appear how deep the crack was, how long it had been there, or whether caused by the fire. Another witness stated that the wall was out of plumb, and bulged out somewhat toward the top; but the accuracy of the observations of this witness was extremely doubtful. It does not definitely appear to what extent the wall bulged, the cause of it, how long it existed, or whether it had anything to do with the falling of the wall.

Other witnesses testified that they were in a room in the building on the opposite side of the street, whence they could look down to the south side of the wall in question, and that they saw smoke oozing through the wall in various places a short time after the fire; but owing to the presence of ice on the wall, and more or less smoke coming through the windows from the debris, and in view of the absolute lack of evidence that there were any cracks or openings in the wall which would permit smoke to ooze through it, it will be assumed that these witnesses were mistaken. It was also shown that on several occasions within the next four or five days after the fire the debris in the ruins took fire, breaking out into a blaze, and the fire department was called to put it out; but it does not appear that the wall in question was in any particular injured by these intermittent outbreaks of the fire. It also appeared that some of the brick on the inside of the wall scaled off from one-fourth to one-half inch by reason of the heat; but it was not shown that the strength of the wall was materially damaged by that fact. The wall, as it was left standing, contained openings upon the south side which had been occupied by windows. In the third story, and presumably in the fourth and fifth stories, there were seven of these openings. The anchors which supported the joists of the different floors of the building were torn out of the wall when the floors fell, and the openings thus made were about four inches deep, and no doubt tended to weaken the wall to some extent.

The evidence shows that when the wall fell it broke off, through the center portion, even with the bottom of the windows of the third story, while toward the rear the break took a diagonal direction upward from the top of one of the windows in the third story to the top of the windows in the rear of the fifth story. In the front part of the wall toward Fifth street, next to the Russell Building, the break occurred

about even with the bottom of the windows in the fourth story; but the record does not inform us whether the break occurred at or near the anchor openings. The wall must have been subjected to very strong pressure on account of the wind, for the reason that large portions of it remaining intact were found a considerable distance towards the south.

The result of our examination of the evidence on this point leads to the conclusion that the only substantial damage the wall received by reason of the fire was caused by the falling of the supports and floors, and consequently the tearing out of the joists in the wall; and we shall assume that the fire, to all intents and purposes, ceased to exist as a damaging factor December 13, and that the wall, considered by itself, was very much stronger than it would have been had it been newly built and left standing without the support of the building. The evidence shows that the first two stories were used for rebuilding, and we shall assume that, had it not fallen, the wall would have been proper to use in reconstructing.

Having now before us a full statement of the facts as disclosed by the evidence, the next inquiry will be as to the meaning of the "lightning clause." The policy was of the standard form, insuring against loss or damage by fire, and the lightning clause was a rider in the following words:

### Minnesota—Lightning Clause.

This policy shall cover any direct loss or damage caused by lightning, whether fire ensues or not (meaning thereby the commonly accepted use of the term "lightning," and in no case to include loss or damage by cyclone, tornado, or windstorm), not exceeding the sum insured, or the interest of the insured in the property, and subject in all other respects to the terms and conditions of this policy.

Appellant takes the position that the words of exception, "in no case to include loss or damage by cyclone, tornado, or windstorm," have reference to the policy as a whole, and that there is no liability if the fall of the wall was due, directly or indirectly, to the windstorm. While this clause is to be considered in connection with the entire con-

tract, the exception referred to is limited to the rider itself, and was not intended to vary the terms of the policy to which it was attached. The insurer undertakes to compensate for any damages caused directly by lightning, but nothing else. For the purpose of making it clear that the risk was limited to lightning only, the clause defines that term as the "commonly accepted use of the term 'lightning' "; that is, such damages as are caused by lightning itself, and not by other things which may concur therewith in affecting damage, viz., fire, cyclone, windstorms, etc.

In Beakes v. Phœnix, 143 N. Y. 402, 38 N. E. 453, 26 L. R. A. 267, a similar clause was under consideration. The building was struck by lightning, and immediately thereafter a high wind came up, but no fire resulted. Part of the damage was done by the lightning and part by the wind, and the court held that the liability of the company was limited to the direct loss caused by the lightning, and expressly excluded the damage resulting from the tornado or windstorm, however difficult it might be to make the distinction. See, also, Warmcastle v. Scottish, 201 Pa. St. 302, 50 Atl. 941; Id., 210 Pa. St. 362, 59 Atl. 1105. Except for the express words excluding damage by cyclone, tornado, or windstorm, the damage arising by reason of the wind would have been covered by the policy upon the ground that it was necessarily connected with the lightning which shattered the building. Such is the effect of the above decisions. "But a specific provision for liability for any loss or damage caused by lightning renders the insurers liable for all known effects of lightning, and not merely for losses thereby when ignition or combustion follows, even though the policy also provides against all loss or damage by fire." Joyce, Ins. § 2790.

The standard policy is a contract to insure against loss by fire, but subdivision 3, § 1640, R. L. 1905, permits insurance against damage by lightning and authorizes the use of the clause: "Also any damage by lightning, whether fire ensues or not." Granting that the statute empowers an insurance company to limit the risk to the effects of lightning, excluding cyclones, etc., there is no authority to introduce in a lightning clause, or otherwise, restrictions which are in conflict with the main purpose of the standard policy to insure against loss from damage by fire, i. e., loss caused proximately by fire. Wausau v. United, 123 Wis. 535, 101 N. W. 1100.

This brings us to the main question in the case: What was the proximate cause of the damage? Exhaustive briefs have materially aided in the examination of this question, and we are frank to admit that there are some cases which seem to support appellant's claim that the wind was the immediate agent which caused the fall of the wall and consequent damage. Whatever may have been the original meaning of the maxim, "Causa proxima et non remota spectatur," it has been clearly settled by a long line of decisions that what is meant by proximate cause is not that which is last in time or place, not merely that which was in activity at the consummation of the injury, but that which is the procuring, efficient, and predominant cause. Thus in our own state, in Ransier v. Minneapolis & St. L. Ry. Co., 32 Minn. 331, 20 N. W. 332, in applying the maxim, it was held that in a negligence case the wrongdoer was responsible for all the injuries which resulted as the natural consequence of his misconduct, such consequences as might have been reasonably anticipated as likely to occur, and that whether an injury in a particular case was the natural proximate result of the wrong complained of is ordinarily a question of fact for the determination of the jury. In Christianson v. Chicago, St. P., M. & O. Ry. Co., 67 Minn. 94, 69 N. W. 640, it was said: "Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate." Again, in Strobeck v. Bren, 93 Minn. 428, 101 N. W. 795, the following definition of proximate cause was adopted: "The proximate cause of an injury, within the meaning of the law of negligence, is such cause as operates to produce particular consequences without the intervention of any independent or unforeseen cause or event, without which the injury could not have occurred—such consequences as might reasonably have been anticipated as likely to occur from the alleged negligent act."

Proximate cause has also been defined as being that from which the effect might reasonably be expected to follow, without the concurrence of any unforeseen circumstances. The rule is stated in Marble v. City, 4 Gray, 412: "Having discovered an efficient, adequate cause, that is to be deemed the true cause, unless such new cause, not incidental to, but independent of, the first, shall be found to intervene between it and the result." In Brady v. Northwestern, 11 Mich. 425, the rule is dis-

cussed as follows: "Much is said by judges of the proximate and remote cause of the loss; and the distinction was very elaborately discussed by counsel in the present case. But, after careful consideration, I must confess that, to my mind, the word 'proximate' is unfortunately used, and serves often to mislead the inquirer, and to produce misapprehension of the real rule of law. That which is the actual cause of the loss, whether operating directly, or by putting intervening agencies, the operation of which could be reasonably avoided, in motion, by which the loss is produced, is the cause to which such loss should be attributed. * * *" In speaking of the rule as applied to insurance cases, it is said (section 2832, Joyce, Ins.): "It may be generally stated that the loss in insurance cases must be proximately caused by a peril insured against, and that the contract does not contemplate an indemnity to the assured where the peril is the remote cause of loss."

In discussing the liability to misapply the maxim, Mr. Phillips (Phillips, Ins. § 1132) observes: "In case of the concurrence of different causes, to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or is not in activity at the consummation of the disaster." Again: "In every insurance, the risk on each peril is liable to be affected by every other peril; and the party, whether insurer or assured, at whose risk a peril is, must bear the loss by such peril, though it may have been indirectly and incidentally enhanced by another, for which he is not answerable, where there is no express or implied stipulation, obligation, or condition against the subject being exposed to such other peril; but, where the loss is by a risk insured against that is enhanced by a peril to which the subject is exposed in violation of the express or implied stipulations of the parties, the underwriter is not liable for it." Section 1134.

In this connection it should be noted that it is not necessary, under policies of this character, that the damage should be occasioned by direct contact with the fire. To render the fire the immediate or proximate cause of the loss or damage, it is not necessary that any part of the insured property actually ignited or was consumed by fire. Ermentrout v. Girard Fire & Marine Ins. Co., 63 Minn. 305, 65 N. W. 635, 30 L. R. A. 346, 56 Am. St. 481, where it was held that the fall of the insured building was within the policy, although no part of it ig-

nited or was consumed by fire. See, also, New York v. Traders, 132 Mass. 377, 42 Am. 440.

A few leading cases will be sufficient to illustrate the maxim. In Lynn v. Meriden, 158 Mass. 570, 33 N. E. 690, 20 L. R. A. 297, 35 Am. St. 540, a building and machinery used for generating electricity for electric lighting were insured against loss or damage by fire. A fire occurred which caused a "short circuit" of the electric current, resulting in damage to certain machinery in the building not reached by the fire. It was held that the injury to the machinery caused in this way was a "loss or damage by fire," within the meaning of the policy. The court said: "They must be presumed to have contemplated such effects as fire might naturally produce in connection with machinery used in generating and transmitting strong currents of electricity." Our attention has been called to a case from the Civil Court of Manchester, England (Gaskarth v. Law, 6 Ins. Law J. 159), where it was held that the insurance company was liable for damages caused by the falling of the wall during a violent gale some time after the fire; but the facts are not fully stated and the principles are not discussed. In Stover v. Insurance Co., 3 Phila. 38, the facts are essentially different and the case has no application. The policy insured against loss by fire or storm, and it was held that a freshet occasioned by the melting of snows and rain was not within the terms of the policy. The case turned on the meaning of the word "storm," and it was held that in the ordinary and popular sense of the word, a freshet was not a storm. Another case, which illustrates that the later, and not the earlier, incident in the chain of events, may constitute the proximate cause, is Foster v. Fidelity, 24 Pa. Super. Ct. 585, where it was held that no recovery could be had for an injury to the insured building by reason of a fire engine, on its way to a fire, being deflected from its course and colliding with the building in question, but is not in point.

In this connection we will refer again to Strobeck v. Bren, 93 Minn. 428, 101 N. W. 795, cited by appellant. In that case the defendant occupied a piece of land located between the railway right of way fence on one side and plaintiff's land on the other. A tree, blown over by a heavy windstorm, broke down the dividing fence, and plaintiff's cattle passed through the opening thus made, across defendant's land, and through a gate in the right of way fence onto the railroad, and

were injured. The action was founded upon the ground that the defendant was liable for leaving the gate open. The court held that the opening in the division fence made by the falling tree was the proximate cause of the result, and that failure to keep the gate closed was a mere incident. We discover no analogy in that case to the one under consideration.

More nearly in point are the following: In Insurance Co. v. Boon, 95 U. S. 130, 24 L. Ed. 395, the policy of insurance was upon certain goods then in storage in the city of Glasgow, Missouri, and contained the following stipulation: "Provided always, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power." October 15, 1864, an armed force of rebels, under military organization, surrounded and attacked the city. The Union forces defended, and battle continued for many hours, and when it became apparent to the Union commander that the city could not be successfully defended, in order to prevent the military stores from falling into the hands of the enemy, set fire to the city hall, which was consumed with its contents. The fire spread to the building next adjoining, and from that, through two other buildings, to the store containing the insured goods, which were destroyed. The court held that the fire which destroyed the goods was within the exception of the policy, and that there was no liability; that the attack of the enemy was the proximate cause of the loss; that the fire which caused the destruction of plaintiff's property happened or took place, not merely in consequence of, but by means of, the rebel invasion and military or usurped power. The fire occurred while the attack was in progress, and when it was about being successful; that the attack, as a cause, never ceased to operate until the loss was complete, and it was the causa causans which set in operation every agency that contributed to the destruction. The inquiry must always be whether there was any intermediate cause disconnected from the primary fault, and self-supporting, which produced the injury. The burning of the city hall and the spread of the fire afterwards was not a new and independent cause of loss. On the contrary, it was an incident, a necessary incident and consequence, of the hostile rebel attack on the town.

A case almost directly in point is that of Johnston v. West, 7 Court of Sessions Cases, 52, where a house covered by a policy of insurance from damage by fire had been injured by the falling of a gable of another house in consequence of fire in that house, and it was held that the company was liable, although the house insured had not been on fire, and the gable of the other house had stood two days after the fire was extinguished, and fell in the course of taking the house down. Insurance Co. v. Transportation Co., 12 Wall. 194, 20 L. Ed. 378, and New York v. Traders, 132 Mass. 377, 42 Am. 440, illustrate the rule applicable where an efficient cause nearest the loss is expressly insured against. In such cases the insurer is not to be relieved from responsibility by showing that the property was brought within that peril by a cause not mentioned in the contract.

Applying these principles, it is evident that the contract must be considered from the standpoint of the parties at the time of its execution, in the light of the surrounding circumstances. The risk as defined by the policy covered whatever causes produced the result. The inquiry resolves itself to determining whether or not the wind was an incident in the chain of events, or the primary cause. If, at the time the contract was entered into, windstorms of the character which arose on the night of December 13 were liable to occur at any time, then the parties contracted with reference to such a possibility. If they could reasonably have foreseen that a fire might leave the wall, sixty nine feet high and one hundred and fifty seven feet long, exposed to winds likely to occur, and that such a wind might blow it down, then such contingency was an element in the risk. The mere fact that the wall stood for the period of several days is not important, provided the wall was not subjected to such a test as occurred on the seventh day. The same inquiry now calling for solution would present itself had the wind come up one, two, or three days after the 13th. The question is not alone, how much was the standing wall weakened by the fire? but rather, did the fire leave the wall in such an exposed condition that the wind produced an effect which would not have been produced except for the fire?

The attention of all the experts who testified was carefully drawn to the condition of the wall as it stood after the fire, and we must accept

their conclusions that it was safe for the purpose of rebuilding, and that it was not materially damaged for such purpose by the scaling of the bricks by the heat, or the tearing out of the anchors. But, granting that to be true, a standing wall one hundred and fifty seven feet long and sixty nine feet high was unquestionably a menace when open to the force of the wind blowing at the rate of forty to fifty miles an hour. The inspectors and experts may not have considered the effect of such force when speaking of the safety of the wall. The record is not clear upon that point; but the mere fact that they examined the wall, and found it was not materially injured by the fire, does not relieve the insurers from the terms of the contract. In all probability the wall would have stood until the building was reconstructed, had it not been for the wind which came at a critical time. Although the later agency in the work of destruction, was it the real cause of the damage? The wind was not the cause, if it was an intervening agency which could reasonably have been foreseen. It could not reasonably have been foreseen if it was an improbable event, not likely to occur. Winds, such as arose December 20, were liable to occur at any season of the year.

It certainly does not conclusively appear from the evidence that such an event should not have been contemplated by the parties when they entered into the contract. It was at least a question of fact, and the finding of the trial court that the fire was the cause of the injury is sustained.

Order affirmed.