ERVIN C. ANDERSON, *d. b. a.* BAR HARBOR, v. CONNECTICUT
FIRE INSURANCE COMPANY AND OTHERS.[1]

July 7, 1950.

Nos. 35,094, 35,095, 35,096, 35,097.

---

[1]Reported in 43 N. W. (2d) 807.

470

*Bowen & Bowen* and *Arthur T. Peterson,* for appellants.

*Ryan, Ryan, Ryan & Ebert* and *Edward L. Rogers,* for respondent.

MATSON, JUSTICE.

Appeal from orders denying defendants' alternative motions for judgment notwithstanding the verdict or a new trial.

Defendant insurers, four in number, each issued to plaintiff an insurance policy for $12,000 insuring him against all loss or damage to his building from "windstorms, cyclones, and/or tornadoes," subject, however, to the proviso that the insurer "shall not be liable for any loss or damage caused by snowstorm, blizzard, frost or cold weather; * * *." The insured building, known as the Bar Harbor dance hall and tavern, is a one-story structure located in Cass county on Gull Lake. It is built in the shape of a T with the main part of the structure corresponding to the top of the T located on land, and with the leg of the T supported by 160 pilings, extending in a northerly direction from the lake shore out over the waters of a channel. The top of the T is 90 feet long and 50 feet wide and extends east and west, whereas the leg of the T is 90 feet long and 50 feet wide with a full-length porch 10 feet wide on each side. A gable roof covered the leg structure with one side sloping to the east and the other to the west. This roof was joined at right angles to a similar roof on the top part of the T which sloped respectively

north and south. Braced and timbered heavily as an integral part of the framework and roof of the leg structure, at its extreme northerly end, was a cupola or tower about 8 or 10 feet higher than the ridge of the roof, and from this tower a flagpole, anchored to an inside beam, projected upward another 8 feet. To the north the building was sheltered by a high bank on the opposite side of the channel, but to the east it was exposed to an expanse of open water for a distance of about four miles.

The primary issue is whether the building was damaged by a windstorm within the coverage of the policy or by a blizzard within the meaning of the exclusionary clause. The facts, *as the jury could reasonably find them from the conflicting evidence,* are that on Friday forenoon, February 27, 1948, a storm of considerable intensity commenced and did not abate until the following Sunday. A strong wind blew from the east and was variously estimated by witnesses as a "terrible gale," as the strongest east wind in "11 years," as "blowing terribly strong, because it almost took me off my feet," as "so terrific you could hardly stay on the highway," and that it was a "40 or 45 mile wind." Snow from 21 to 24.5 inches fell on Friday and Saturday. The visibility was poor. A tree broke off at its base and fell across a telephone line. As early as Friday, between 4 and 5 p. m., the flagpole and tower on plaintiff's building were observed leaning to the west. Shortly after noon on Saturday, the tower and the end of the building were plainly seen to lean as much as four or five feet to the west. Sunday noon, on the east half of the leg roof, "there was very little snow, only a few little spots where there would be a few inches, and you could see the shingles mostly all over." On Tuesday it was first discovered that the leg of the T-shaped building had collapsed by tipping from the east toward the west so that the west wall was lying beneath the roof and the peak or ridgepole of the roof was 8 or 10 feet to the west of the true center line of the building. In other words, both side walls tipped to the west or in the same direction as the wind was blowing. Anchoring nails and bolts were also pulled or bent toward the west. In its collapsed condition,

the east half of the roof was found to be covered with very little snow, but the west half had a layer of 10 or 12 inches. The main part of the building, or the top of the T, was found to have twice as much snow on its roof, but it did not collapse, although, *as a weight-supporting structure, it was weaker than the leg of the T.*

■ Was the damage to the building caused by a windstorm, as plaintiff contends—and as the jury must have found—or was it caused by a blizzard or snowstorm, as alleged by defendants? The question was submitted to the jury with instructions which did little more than define *windstorm, snowstorm,* and *blizzard* in terms of causation. *Windstorm* was defined as a storm wherein the wind, and not snow or rain, is the efficient and proximate cause of the damage. A *snowstorm* was defined as a storm wherein snow is the efficient and predominant cause, and a *blizzard* as a storm wherein the efficient and proximate cause of damage is not wind, but snow, rain, frost, or cold weather or a combination thereof.

Was all question of fact precluded by the plain language of the policies? Is a high wind a windstorm only so long as it is unaccompanied by snow? When does it become a blizzard? Weather disturbances are frequently and popularly described by more than one term. Although the language of the parties to an insurance policy must be given its natural and ordinary meaning, and the words used are to be taken in their popular sense, such language and words as expressive of intent cannot be wholly disassociated from the purpose for and subject to which they are applied. The idea content of a word is frequently conditioned and modified by the subject to which it is applied (Maze v. Equitable L. Ins. Co. 188 Minn. 139, 246 N. W. 737), as well as by the geographical area or environment in which the word is used. In the present case, the parties were contracting for insurance against the hazard of windstorm in a northern area, where, with rare exceptions, it would be difficult during half of the calendar year to have a windstorm without an accompaniment of flying snow. Naturally, where seasonal snows fall, questions of fact will arise as to whether a winter storm is primarily a windstorm or a blizzard, and the answer is not to be

found in any arbitrary rule of law. Under such circumstances, are we to overlook the obvious purpose of the contracting parties by adopting a strict interpretation and thereby ascribe to them the absurd intent of contracting for the payment of a year-round premium to cover a risk that is practically inoperative half the year? To hold that the parties did not contract with reference to the falling of snow in midwinter is to ignore realities. See, Mork v. Eureka-Security F. & M. Ins. Co. 230 Minn. 382, 42 N. W. (2d) 33. No doubt the parties could so agree, but where the words as related to the subject matter do not compel so narrow an interpretation, it should be avoided. See, Maze v. Equitable L. Ins. Co. *supra.* Where, as here, the language is not so explicit as to be free from ambiguity, insurance policy provisions are to be liberally construed in favor of the insured. Cavallero v. Travelers Ins. Co. 197 Minn. 417, 267 N. W. 370.

The Texas court, in Fireman's Ins. Co. v. Weatherman (Tex. Civ. App.) 193 S. W. (2d) 247, 248, recognized that a windstorm varies in its characteristics from one area to another when it said:

"* * * An East Texas windstorm would probably be accompanied by heavy precipitation, while a West Texas windstorm would probably be dry, but might be accompanied by so much dust as to limit visibility."

In the instant case, the windstorm, which is not unusual for Minnesota, was accompanied by heavy precipitation in the form of snow and the visibility was limited. It is true that Webster's New International Dictionary (2 ed.) 1947, gives one definition of "blizzard" as "a severe and prolonged snowstorm" (in keeping with the terminology used by many witnesses herein), but the parties by specifically designating a *snowstorm* as an excluded risk separate and apart from the risk of a *blizzard* made it clear that the word "blizzard" was not used in that sense. The same dictionary gives another and more complete definition of a "blizzard" as "an intensely cold high wind filled with fine snow." As typical of a blizzard, the intensely cold wind is usually accompanied by fine, driving snow. 5 Wd. & Phr. (Perm. ed.) p. 545. The evidence

here does not point to fine, wind-driven snow as distinguished from the usual feathery flakes characteristic of a heavy snowfall. There is likewise nothing to indicate that the weather or the wind was intensely cold. Under the circumstances, the jury could reasonably find that there was no blizzard *within the meaning of the policies,* although the storm combined the elements of both a windstorm and a snowstorm.

As between the high wind and the heavy snow, the jury, taking the view of the evidence most favorable to the verdict, could likewise reasonably find that the efficient and proximate cause of damage to the building was the wind. On the afternoon of the first day of the storm, before the bulk of the snow had arrived, the flagpole, which was a solid part of the structure, was seen leaning to the west. The next day, the building itself was leaning as much as four or five feet in the direction the wind was blowing. Sunday the east half of the roof had very little snow. After the building had fallen by tipping to the west, it was then found that the west half of the roof had a heavy snow burden. Experts testified that if the weight of the snow had been the predominant cause of the building's collapse, with the overwhelming bulk of its weight on the west half of the roof, the structure would have tipped to the east and not to the west, and that if the weight of the snow had been evenly distributed between the two sides, the collapse would have been straight downward. That the snow was not the efficient cause is further shown by the fact that the main building, which was less vulnerable to an east wind but was weaker as a weight-supporting structure, remained standing, although it was laden with about twice as much snow. The jury could reasonably infer that the wind was the proximate or efficient and procuring cause which tipped the building as much as four or five feet leeward, and thus materially weakened it as a weight-supporting structure, and that, absent such weakening by the wind, it would not have collapsed. Where an insurance policy expressly covers the risk of loss to a building from windstorm, liability for such loss is established where it is shown that the windstorm by its own unaided action was of

sufficient violence to be the efficient and proximate cause of the damage or where, as the efficient and proximate cause—though not the sole cause—it brings about such a material weakening of the building that it collapses from the weight of accumulated snow, and which collapse would not have taken place had not the structure first been weakened by the wind. It is immaterial that the damage following from the efficient and proximate cause may have been indirectly and incidentally enhanced by another cause expressly excluded from coverage. Russell v. German F. Ins. Co. 100 Minn. 528, 111 N. W. 400, 10 L.R.A.(N.S.) 326; Trexler Lbr. Co. v. Allemannia F. Ins. Co. 289 Pa. 13, 136 A. 856 (directly in point as involving windstorm damage aided by contributing cause of heavy snow); Hartford S. B. Inspection & Ins. Co. v. Pabst Brg. Co. (7 Cir.) 201 F. 617; Jordan v. Iowa Mut. Tornado Ins. Co. 151 Iowa 73, 130 N. W. 177, Ann. Cas. 1913A, 266; Kinney v. Farmers' Mut. F. & Ins. Society, 159 Iowa 490, 141 N. W. 706, Ann. Cas. 1915A, 609[2]; see, Ermentrout v. Girard F. & M. Ins. Co. 63 Minn. 305, 65 N. W. 635, 30 L. R. A. 346, 56 A. S. R. 481; Mork v. Eureka-Security F. & M. Ins. Co. 230 Minn. 382, 42 N. W. (2d) 33.

■ Although the definitions of *windstorm, blizzard,* and *snowstorm* as given to the jury were sketchy and might well have been amplified, we find, in the light of the evidence and the policy terms, no error prejudicial to defendants. Whether the wind was of sufficient force to constitute a windstorm was for the jury, and its verdict thereon is sustained. Likewise, it was for the jury to determine whether a windstorm was the efficient and proximate cause of the

---

[2]Defendants seek to distinguish the Iowa decisions on the ingenious ground that the Iowa court speaks of the shifting of the burden of proof and that in this jurisdiction we follow the theory that only the burden of going forward with the evidence shifts. Although the matter is of little consequence in that the evidence clearly sustains the verdict, we note that the distinction *as here applied* is one of labels and not of substance. It should not be overlooked that courts sometimes use the term "burden of proof" in two different senses, namely (1) as the "risk of non-persuasion," and (2) as the "burden of going forward with the evidence." See, 15 Minn. L. Rev. 600; 18 Minn. L. Rev. 359; 58 Harv. L. Rev. 180; 9 Wigmore, Evidence (3 ed.) §§ 2485, 2487, and 2489.

damage to the building within the coverage of the insurance policy, or whether a blizzard or a snowstorm was the efficient and proximate cause thereof within the meaning of the exclusionary clause.[3]

 Pursuant to a coinsurance clause, defendants contend that, because plaintiff failed to introduce any evidence of the actual cash value of the building at the time of loss, one of the necessary elements for establishing the amount of his damages is missing, and there is no basis for the verdict. The policies, which stated the insurable value to be $50,000, contained a coinsurance clause, which was simply an agreement, as a condition of the contract, that the insured should maintain insurance on the property to the extent of at least 80 percent of the actual cash value at the time of loss, in default of which the insured, to the extent of such deficit, should bear a proportionate share of the loss. M. S. A. 65.05 provides:

"* * * the actual cash value of the property so insured at the time of the loss, including the buildings, shall be the basis for determining the proper amount of the coinsurance, and the amount of loss, notwithstanding any previous valuation of the building."

In Oppenheim v. Fireman's Fund Ins. Co. 119 Minn. 417, 138 N. W. 777, we held that under a coinsurance clause the insured, in the event of a *partial* loss, does not become a coinsurer, so as to constitute the policy an open one under which the loss is determined with reference to the cash value of the property at the time of the loss—as distinguished from the insurable value stated in the policy—*unless and until the insurance carried falls below the stipulated 80 percent.* Defendants' contention has no merit, unless plaintiff had the burden of proof in establishing that he did not become a coinsurer because the insurance carried fell below 80 per-

[3]Ermentrout v. Girard F. & M. Ins. Co. 63 Minn. 305, 65 N. W. 635, 30 L. R. A. 346, 56 A. S. R. 481; Thomas J. Mulgrew Co. v. National Union F. Ins. Co. 187 Iowa 1292, 175 N. W. 50; Schaeffer v. Northern Assur. Co. Ltd. (Mo. App.) 177 S. W. (2d) 688; Penn Refractories Co. v. Lititz Mut. Ins. Co. 54 Pa. D. & C. 99, 27 Westmoreland L. J. 165; National F. Ins. Co. v. Albers, 167 Md. 599, 175 A. 597; Pearl Assur. Co. Ltd. v. Stacey Bros. Gas Const. Co. (6 Cir.) 114 F. (2d) 702.

cent of the actual cash value. Plaintiff obligated himself to carry 80 percent of such value. In the absence of evidence to the contrary, the presumption is that insured has discharged his obligations under the insurance contract. Palatine Ins. Co. Ltd. v. O'Brien, 107 Md. 341, 68 A. 484, 16 L.R.A.(N.S.) 1055; see, 29 Am. Jur., Insurance, § 1440. When the plaintiff insured establishes a prima facie case, he is entitled to have it go to the jury, and the burden then rests upon the defendant insurer to prove all matters of defense in rebuttal of such prima facie case. No burden rests on the insured to offer evidence negativing anticipatory defenses by the insurers. Hawkeye Clay Works v. Globe & Rutgers F. Ins. Co. 202 Iowa 1270, 211 N. W. 860. The coinsurance clause, if called into operation, would not only convert the policy from a valued to an open one, but would also reduce or limit the amount of plaintiff's recovery, and as such the burden of establishing facts to prove that the clause had become operative was in the nature of an affirmative defense which rested upon the defendants. Gibbs v. Central Surety & Ins. Corp. 163 Kan. 252, 181 P. (2d) 498; Camden F. Ins. Assn. v. Wandell (Tex. Civ. App.) 195 S. W. 289. It is well settled that if the defendant insurer seeks to avoid or reduce its liability, whether it be for nonfulfillment of an obligation or condition imposed on the insured or for the violation of an affirmative representation or condition subsequent, the burden is on the defendant to prove the facts to establish such avoidance or reduction.[4]

Defendants contend that the plaintiff is foreclosed upon this appeal from asserting that the defense of coinsurance *is an affirmative*

[4]See, Dechter v. National Council, 130 Minn. 329, 153 N. W. 742, Ann. Cas. 1917C, 142; Smith v. Ohio Millers Mut. F. Ins. Co. 325 Mo. 51, 26 S. W. (2d) 962; Colker v. Connecticut F. Ins. Co. 224 Ky. 837, 7 S. W. (2d) 502; Glantz v. Western Assur. Co. (Pa.) 43 Lackawanna Jurist 197; Camden F. Ins. Assn. v. Wandell, *supra;* Gibbs v. Central Surety & Ins. Corp. *supra;* Kinney v. Farmers' Mut. F. & Ins. Society, 159 Iowa 490, 141 N. W. 706, Ann. Cas. 1915A, 609; London & Provincial M. & F. Ins. Co. v. Mullins, 264 Ky. 780, 95 S. W. (2d) 588; 29 Am. Jur., Insurance, § 1440; 46 C. J. S., Insurance, § 1316(7) p. 400, and § 1318(7) pp. 421, 422; 21 Appleman, Insurance Law and Practice, § 12096.

*one upon which the defendants have the burden of proof,* in that the court's instruction that plaintiff bore the burden of proving the nature and extent of his damages (to which plaintiff took no exception) is the law of the case. Although it is true that plaintiff must prove the nature and extent of his damages, the burden thereof does not include proof that a clause limiting liability has become operative. The instruction did not cover any affirmative defense which defendants might have under the coinsurance clause.

■ Defendants insist that plaintiff is not the real party in interest (§ 540.02), and therefore cannot maintain the actions. The insurance policies designate plaintiff's mortgagee as entitled to payment of loss as its interest may appear. Admitted in evidence is a written instrument executed by the mortgagee whereby it gave its express consent to the institution and prosecution of the actions herein by the plaintiff and whereby it waived "any rights it might have to prosecute said actions in its name." Undoubtedly defendants have a statutory right to have the causes of action against them prosecuted by the real party in interest. § 540.02. The purpose of the statute is to save a defendant against whom a judgment may be obtained from further vexation at the hands of other claimants for the same demand. McGuigan v. Allen, 165 Minn. 390, 206 N. W. 714; Blair v. Espeland, 231 Minn. 444, 43 N. W. (2d) 274. If that purpose is satisfied, the requirements of the statute are satisfied. If the mortgagee, as the real party in interest under an insurance policy in the event of loss, gives to the plaintiff insured its consent that suit be prosecuted in plaintiff's name alone and the mortgagee waives any rights it may have to bring an action in its own name and thus estops itself from suing the insurer, as was here done, plaintiff thereby becomes qualified as the real party in interest, because any judgment in his favor will bar other suits for said losses by the mortgagee. We have so held with respect to compensation claims (McGuigan v. Allen, *supra*), and a "loan receipt" given by an insurance company to the insured in an automobile damage case (Blair v. Espeland, *supra*). The same fundamental principle is here involved. See dicta in Graves v. American Live-

Stock Ins. Co. 46 Minn. 130, 48 N. W. 684; Maxcy v. New Hampshire F. Ins. Co. 54 Minn. 272, 55 N. W. 1130, 40 A. S. R. 325. The principle is not new. Jefferis v. London Assur. Corp. (D. C.) 16 F. Supp. 590.

■ Plaintiff served no notice of trial upon defendants before the beginning of the general term as required by § 546.05. If no statutory notice of trial is given, the other litigant is entitled to have the verdict set aside and a new trial granted *regardless of whether prejudice has resulted or not* (Dr. Ward's Medical Co. v. Wolleat, 148 Minn. 410, 182 N. W. 523), unless such notice has been waived. Allis v. Day, 14 Minn. 388 (516). Was the statutory notice waived by defendants? On August 12, 1948, only about three days before defendants' time for answering had expired, defendants' applications for removal of the cases to the United States district court were submitted to the state district court and taken under advisement. Plaintiff asserts that the parties then verbally agreed that no advantage would be taken of the default in answering if ultimately the cases remained in the state district court *and were tried at the next term*. Defendants dispute that the stipulation embodied a condition that the cases should be tried at the next term, which would open on October 5, 1948. Defendants thereafter moved the federal court for restraining orders to enjoin plaintiff from proceeding in the state court. On September 1, 1948, defendants, pursuant to the new judicial code (28 USCA, §§ 1446, 1447), effected a removal to the federal court. The next day plaintiff moved to have the causes remanded to the state district court. That court on August 25, 1948, denied defendants' petition for removal, and on October 19, 1948, the federal court granted plaintiff's motion for a remand. Before these various proceedings in the two courts had been determined, defendants obviously did not wish to interpose answers and thus recognize the state court's jurisdiction. August 24, 1948, defendants wrote plaintiff to make certain that the "understanding with respect to deferring any action in the State Court until the matter of removal has been settled will also apply to the

filing of the answers in the Federal Court." In reply, plaintiff on August 25 wrote:

"It may be still understood that you will have ample time to file answers in the Federal Court if the actions are not remanded.

"If, however, it should transpire that time goes on without a decision so that we approach the October Term in Cass County, *we will have to have it understood that answers must be interposed in at least sufficient time to enable us to get the cases on for trial there.*" (Italics supplied.)

On October 5, 1948, Arthur T. Peterson, Esq., upon the request of defendants, then attorneys of record, attended the opening of the district court term to ascertain whether any reference would be made to these causes. At this time plaintiff made a motion that the cases, subject to remand by the federal court, be placed on the calendar. Mr. Peterson, who informed the court that he was not appearing for the defendants, requested that consideration of the motion be postponed to enable defendants' counsel, Messrs. Bowen & Bowen, to appear personally in opposition thereto. The trial court, however, granted the motion, of which fact Messrs. Bowen & Bowen were promptly informed by Mr. Peterson. By letter dated October 27, 1948, defendants mailed their answers to plaintiff's counsel for admission of service. November 1, plaintiff's counsel answered as follows:

"We have admitted service on the originals and return them herewith. These cases are on the Cass County October term calendar for trial as you know and this *service is admitted at this date upon the answers with the same reservation set forth in our letter to you of August 25th, i. e. that the cases are to be tried at the present pending term in Cass County.*" (Italics supplied.)

November 3, defendants, by letter, advised plaintiff that they had never agreed that the causes should be placed on the calendar without statutory notice of trial. No motion to strike the cases from the calendar was made by defendants until December 2, 1948, when the trial opened. The motion was denied. Throughout, the

parties have been represented by experienced and able counsel, who undoubtedly were aware that the statutory notice of trial had to be served prior to the opening of the trial term, which was scheduled for October 5. Pending determination of whether the cases should be tried in the federal or the state court, defendants desired to be protected from default for failure to answer. Plaintiff desired to have the cases heard during the October term. A verbal stipulation was made, the exact terms of which are none too clear, but in the light of the surrounding circumstances, with special reference to plaintiff's letters of August 25 and November 1, as well as defendants' apparent expectation that the cases would be placed on the calendar—as revealed by the presence of Mr. Peterson at the opening of the October term for the express purpose of ascertaining what action would then be taken—we cannot say that the trial court was unjustified in finding that the stipulation in effect embodied a waiver by defendants of the statutory notice of trial. We so hold. We likewise find no error in the placing of the cases upon the state district court calendar, subject to their being remanded by the federal court.

■ The trial court did not err in ordering *a consolidation of the trials* of the four actions into *one trial.* No estoppel arose to bar such consolidation by virtue of plaintiff's representations to the federal court that the four actions were each separate and distinct from each other or by reason of plaintiff's having obtained on that basis a decision for a remand. This becomes clear when we keep in mind that—

"Strictly speaking, *we are not here concerned with a consolidation of actions, but merely with a consolidation of trials.* The former brings about a merger of two or more actions into one, whereby each loses its separate identity, whereas in the case of consolidation of trials there is no loss of identity of an action." (Italics supplied.) Chellico v. Martire, 227 Minn. 74, 76, 34 N. W. (2d) 155, 156.

Obviously, there was no fundamental inconsistency between the position taken by plaintiff in the federal court and the position he

assumed when he moved for a consolidation, *not of the actions,* but of the trials. Pursuant to Fegelson v. Niagara F. Ins. Co. 94 Minn. 486, 103 N. W. 495, he could have joined the four defendants in one action, but he also had the right, where, as here, each insurance policy constituted a separate and distinct contract which gave rise to a separate cause of action, to sue the defendants separately. There is no indication that plaintiff was motivated by any fraud in suing upon such separate causes for less than the amount required to give the federal court jurisdiction. See, Saint Paul Mercury Ind. Co. v. Red Cab Co. 303 U. S. 283, 58 S. Ct. 586, 82 L. ed. 845. Aside from the statute (§ 546.04), the court had *inherent* power in its discretion to consolidate the trials of the four separate actions, which, though involving independent causes of action, involved the same issues and the same evidentiary facts. Ramswick v. Messerer, 200 Minn. 299, 274 N. W. 179; 1 Am. Jur., Actions, §§ 92, 93. We find no abuse of discretion.

In the light of the foregoing opinion, it is unnecessary to consider the other assignments of error. The order of the trial court is affirmed.

Affirmed.