# MARSHALL PRODUCE COMPANY v. ST. PAUL FIRE & MARINE INSURANCE COMPANY AND OTHERS.

98 N. W. (2d) 280.

August 21, 1959—Nos. 37,702, 37,763.

*Loring M. Staples, Hayner N. Larson, Faegre & Benson, Glenn Catlin,* and *Meehl, Catlin & Wiltrout,* for plaintiff.

*Neville, Johnson & Thompson,* for defendants.

NELSON, JUSTICE.

Plaintiff, Marshall Produce Company, a corporation, owns and operates a plant at Marshall, Minnesota, for the storage and processing of eggs and milk. It buys, grades, and sells eggs in the shell. The processing consists of dehydrating milk and eggs into powdered form. The action is against seven insurance companies to recover for a loss which it claims resulted from fire.

About noon on March 13, 1956, a house located some 75 or 100 feet north of plaintiff's plant caught fire. As a result dense blue-gray smoke, from cardboard and wood, borne by a north wind, poured into the plant, penetrating into every room except the closed freezer room. The record indicates that it was so dense that it obscured objects more than an arm's length away.

The property of the plaintiff, for which recovery is claimed due to loss by fire, has been divided into the following categories: Milk powder in drums; egg powder in drums; egg powder in cans; and shell or raw eggs. The "milk powder in drums" is made from milk brought to the plant and put through various processes, such as spraying and drying, until it is in powder form. Then it is poured into polyethelene bags which are tied, wrapped in kraft paper, and sealed in fiber drums with a strap lock. The "egg powder in drums" is made from raw eggs, processed and sealed in containers in similar fashion to the "milk powder in drums." The "egg powder in cans," referred to as "military egg powder," is made under and pursuant to a contract between plaintiff and the United States government. The purchasing agency is the Quartermaster Corps of the United States Army with the United States Department of Agriculture as the inspecting agency. The specifications of the contract call for hermetically sealed cans, with air drawn out and inert gasses substituted, each can containing three pounds of egg powder with a preservative enzyme added. The cans are packed

six to a box of strong fiber, and the box is closed with glue and then bound with metal straps.

For many years plaintiff had processed the foregoing items at the plant under contract with the Quartermaster Corps of the United States Army and the contract in force in March 1956, as well as prior contracts, required a high standard of sanitation in connection with processing, as well as constant supervision and inspection by inspectors of the United States Department of Agriculture. The sanitary requirements of the department were specifically made a part of the contract. These standards required the plant to "be free from strong foul odors, dust, and *smoke-laden air*." (Italics supplied.) Under the provisions of this Federal contract violation of the sanitary requirements authorized rejection of the products by the government. Time of manufacture as therein applied extended until the cartons leave the plant to be put either aboard a train or other means of transportation. The "egg powder in cans" here involved had been canned, boxed, and strapped and were stored in plaintiff's plant awaiting shipment. The standards contained in the government contract as to sanitary requirements and the "disputes" clause of the contract authorizing rejection upon certain conditions specified therein were matters of which the defendant insurance companies were cognizant when issuing the policies and as the policies were renewed. The record clearly indicates that the defendant companies were informed from the outset and knew at the time of issuing the policies and continued to have knowledge of the fact that most of plaintiff's egg processing was pursuant to and in the performance of government contracts.

At the time the fire broke out there were in storage in the cooler room of the plant and exposed to smoke 1,542 cases and 18 dozen shell eggs of various grades (each case containing 30 dozen eggs); 241 drums of milk powder; 59 drums of egg powder; and 2,250 cases of egg powder which had been processed in accordance with a special formula provided under the Federal contract.

At the time of fire plaintiff carried insurance in all of the defendant insurance companies against loss or damage by fire to the milk powder. Only the policies of defendants St. Paul Fire & Marine Insurance Company and Fidelity-Phenix Fire Insurance Company of

New York insured poultry, eggs, and egg powder "including filled containers." The other defendants covered "Stock, Materials & Supplies, Poultry & Eggs * * *."

The policies of the St. Paul Fire & Marine Insurance Company and Fidelity-Phenix Fire Insurance Company of New York were renewals of the previously issued policies covering merchandise in the plant, including filled containers, first written in 1942 and renewed upon practically the same terms and in the same language thereafter. Those policies are Minnesota standard form policies insuring against "all loss or damage by fire originating from any cause except invasion, or any military or usurped power whatever." These policies also state specifically that plaintiff and its legal representatives are insured "against all loss or damage by fire." The St. Paul Fire & Marine and the Fidelity-Phenix Fire Insurance Company policies not only insured the property against loss or damage but also insured plaintiff against loss or damage by fire to the extent that it might be said that the insurance provided by said policies was in personam as well as in rem. It is also to be noted that the said two policies contained by endorsement a "MARKET VALUE CLAUSE" which reads as follows:

"It is a condition of this contract that the value of finished stock manufactured by the insured shall be that price, less all discounts and unincurred expenses, for which said stock would have been sold had no loss occurred."

All of the policies issued by the defendant companies are Minnesota standard form policies and insure property *"against all loss or damage by fire."* (Italics supplied.) All policies were written at regular rates.

The fire involved was of short duration, lasting possibly an hour. It resulted in smoke penetrating the interior of the plant, causing smoke-laden air to permeate throughout and to remain therein for some period of time and having the effect, according to plaintiff's allegations, of rendering the merchandise in the plant unmarketable and practically worthless. Government officials, both of the Quartermaster Corps and of the Department of Agriculture, after ascertaining the facts as to what had happened and inspecting the merchandise and the premises following the fire, condemned the plant and

all the merchandise in it, and rejected and refused to accept any of the merchandise including the military egg powder, on the grounds of violation of prescribed sanitary requirements including, specifically, contamination of these products stored or contained in the plant during the resulting smoke penetration. It appears from the record that although efforts were made to salvage the merchandise, both sides having more or less indicated their interest to that end, its final disposition was for a negligible price, its market value before the fire being $93,503.96 and after the fire only $7,345.03, a loss in value of $86,158.93.

While plaintiff duly notified the insurance companies, they deny any liability whatsoever on their policies (although one of the companies did pay a claim for damage to the building on a policy insuring the building itself). The insurers finally after some 2 weeks refused actual participation in an attempt to salvage any of the merchandise, leaving this matter entirely up to the plaintiff. None of the insurers requested that plaintiff appeal from the decision of the inspectors or the final decision of government officials acting in behalf of the Quartermaster Corps of the U. S. Army.

The action was tried without a jury, and the court allowed recovery for loss and damage to shell eggs, milk powder, and egg powder packed in drums as follows: Milk powder, $4,873.95; egg powder, $9,770.40; shell eggs, $17,604.58. Plaintiff was denied any relief for its loss on the military egg powder in cans on the ground that it was "not damaged by fire."

The court also found that on March 13, 1956, the defendant companies had individual contracts of insurance with plaintiff, insuring the above property against loss or damage by fire as follows:

Policy No. OM17528, defendant St. Paul Fire & Marine Insurance Company, in the basic amount of $56,250, insuring merchandise consisting principally of poultry, shell, frozen and powdered eggs.

Policy No. OC 32114, defendant Fidelity-Phenix Fire Insurance Company of New York, in the basic amount of $56,250, insuring merchandise consisting principally of poultry, shell, frozen and powdered eggs.

Policy No. 74230, defendant Ohio Farmers Insurance Company, in the basic amount of $28,000 limited to 20% of $10,000 stock at Marshall, Minnesota, insuring material and supplies, excluding eggs.

Policy No. S-324344, Home Fire & Marine Insurance Company of California, in the basic amount of $28,000, limited to 20% of $10,000 stock at Marshall, Minnesota, insuring material and supplies excluding eggs.

Policy No. MN 70212, United States Fire Insurance Company, in the basic amount of $28,000, limited to 20% of $10,000 stock at Marshall, Minnesota, insuring material and supplies excluding eggs.

Policy No. 6380530, The Travelers Fire Insurance Company, in the basic amount of $28,000, limited to 20% of $10,000 stock at Marshall, Minnesota, insuring material and supplies excluding eggs.

Policy No. 71 24 40, Fire Association of Philadelphia, in the basic amount of $28,000, limited to 20% of $10,000 stock at Marshall, Minnesota, insuring material and supplies, excluding eggs.

Judgment was entered on the findings, and plaintiff and defendants both appeal from this judgment.

Plaintiff assigns error as follows: (1) The trial court erred in finding that the egg powder in cans was not damaged by fire; (2) the trial court erred in limiting plaintiff's recovery to loss on milk powder, egg powder in drums, and shell eggs, and in denying plaintiff recovery for its loss on egg powder in cans; (3) the trial court erred in denying plaintiff's request to amend paragraph 5 of the findings of fact by adding thereto an additional item of loss as follows: "To egg powder in cans—$53,910"; (4) the trial court erred in denying plaintiff's request to strike paragraph 6 of the findings of fact which reads "The egg powder in cans was not damaged by fire," and to substitute the following requested findings as numbers 6 and 7:

"6. The United States Quartermaster Corps had contracted to purchase the egg powder in cans, and it was prepared and placed in such cans in accordance with government specifications. The Quartermaster Corps rejected and refused to accept said powder in cans on the ground that the smoke which entered the plant as aforesaid contaminated the plant and the containers in which said powder was packed.

There is no evidence that the decision as to reject and refuse was arbitrary or capricious or so grossly erroneous as to imply bad faith, or that it was of a kind which the Quartermaster Corps was without authority in law to make.

"7. After and by reason of such rejection and refusal, said egg powder in cans could not be sold for more than $1,168.20 and did not have a value in excess of said amount. By reason of smoke entering the plant as aforesaid, the plaintiff sustained loss and damage in respect of said egg powder of $53,910.00."

While the court below found that the egg powder in cans was not damaged, the findings are silent on whether there was damage to the containers or cans in which the egg powder had been packed for shipment pursuant to government specifications and requirements. We specifically, again, note here that the St. Paul Fire & Marine and Fidelity-Phenix policies provide that the merchandise in the plant, "including filled containers," is insured against "all loss or damage by fire originating from any cause except invasion, or any military or usurped power whatever."

The defendant insurance companies assign as errors on their appeal: (1) The trial court erred in finding as a fact that the plaintiff sustained loss and damage by the said fire to milk powder in drums, to egg powder in drums, and to shell eggs in the total amount of $32,248.85; (2) that the trial court erred in denying the request of the defendant insurers to amend paragraph 5 of the findings by striking the language therein contained and substituting therefor language to the effect that none of those items were damaged by fire; (3) that the trial court erred in failing to delete paragraph 6 of the findings of fact and renumbering paragraph 7 thereof as requested by defendants; (4) the trial court erred in denying defendants' request to amend the conclusions of law by striking the language therein and substituting therefor the following: "That defendants are entitled to judgment and their costs and disbursements herein"; (5) that the trial court erred in granting plaintiff's request to amend the conclusions of law by adding the following words thereto: "Together with interest at 6% per annum on said amounts from the tenth day of July, 1956."

We think that the three related questions of law involved in this action, suggested by the plaintiff, are more or less determinative of its outcome. (1) Where a fire insurance policy insures merchandise and the owner thereof against "loss or damage" by fire, is there such "loss or damage" if there is a loss in value to the merchandise and to the owner as the result of a fire, or must there be *physical damage* to the merchandise itself, as well? (2) Where a fire insurance policy insures merchandise in containers and the owner thereof against "all loss or damage by fire" is there such "loss or damage" if there is a loss in value to the merchandise in containers and the owner as the result of fire damage to the containers alone? (3) Where government officials, in the course of their duties, determine that goods processed for delivery under a government contract are so damaged by fire that they are not acceptable to the government, and accordingly reject the goods, which consequently become practically worthless (a) is this official decision conclusive in the sense that it is binding on the insurance companies or (b) if not conclusively binding, does it satisfy whatever burden of proof rests on the insured to show that the insured suffered "loss or damage" by fire where, as here, there is no proof by the insurer negativing the existence of facts which could possibly support such determination?

■ At the outset we may rightly assume that the contracts of fire insurance here involved are contracts of indemnity. This is the rule in Minnesota and it is the rule in other jurisdictions. These fire insurance policies constitute personal contracts with the insured, and unless so expressly stipulated they are not contracts in rem and do not run with the insured property. In the instant case the St. Paul Fire & Marine and Fidelity-Phenix policies are not alone personal contracts with the insured, but they also run with the insured property. Since a contract for insurance against fire ordinarily is a contract for indemnity, it follows that the insured is entitled to receive the sum necessary to indemnify him, or to be put, as far as is practicable, in the same condition pecuniarily in which he would have been had there been no fire; that is, he may recover to the extent of his loss occasioned by the fire, but no more, and he cannot recover if he has sustained no loss. The basis of recovery is therefore the loss in value to the insured, not nec-

essarily physical damage to the property. Being merely personal contracts between the insurer and the insured, they appertain to the person or party to the contract, and not to the thing which is subject to the risk against which the owner is protected. The fact that the aforesaid insurance policies also run with the insured property only adds to or broadens the risk of the coverage. Such a contract includes not only the premises set forth in express words, but, in addition all such implied provisions as are indispensable to effectuate the intention of the parties and such as arise from the language of the contract and the circumstances under which it was made. This is so for the reason that the law regards the substance and not the mere form of the contract—the ultimate purpose the parties had in view, rather than the manner agreed on for effecting the purpose. These rules are fully set forth and approved in Northwestern Mutual Life Ins. Co. v. Rochester German Ins. Co. 85 Minn. 48, 88 N. W. 265, 56 L. R. A. 108; Closuit v. Mitby, 238 Minn. 274, 56 N. W. (2d) 428; 45 C. J. S., Insurance, § 915; 44 C. J. S., Insurance, § 14; 5 Appleman, Insurance Law & Practice, § 3082; 4 Dunnell, Dig. (3 ed.) § 1827; 9 Id. § 4645b.

■ We have already referred to the market value clause specifically made applicable to this particular risk by specific endorsement in the policies covering eggs and egg powder. The measure of damages, therefore, applicable under those fire policies is the difference in market value of the insured's property before and after the fire. The value of the canned egg powder before the fire was fixed by the terms of the government contract at $54,067.50. The record clearly indicates when considered as a whole that after the fire the value of the canned egg powder, since there was found to be little or no demand for such military egg powder in the civilian market, particularly without the U. S. D. A. shield, was reduced by acceptable reductions and net salvage to $157.50. Although evidence offered by defendants complains of a higher value after the fire, it was not admitted. Therefore, on the record, we can only reach the conclusion that the amount of the loss—$53,910—is undisputed. A search of the authorities indicates that they are in complete accord in following the rule that ordinarily the measure of damages under fire policies is the difference

between the market value of the insured's property before and after the fire. See, Bazille & Partridge, Inc. v. American Eagle Fire Ins. Co. 155 Minn. 475, 194 N. W. 14; Knox-Burchard Merc. Co. v. Hartford Fire Ins. Co. 129 Minn. 292, 152 N. W. 650; Lee v. Farmer's Ins. Co. 72 S. D. 127, 32 N. W. (2d) 188; 45 C. J. S., Insurance, § 915b.

■ Defendants' witness, William Schneider, who first indicated that he had buyers for the canned egg powder and then admitted that he was unable to produce on that score, made the general admission that there was a sizable loss in the value of the canned egg powder; a loss which obviously resulted from the fire. The defendants have stressed the claim that the egg powder itself packed within the cans was not physically damaged by the fire and therefore no recovery is permitted on any loss suffered to the merchandise in the plant, "including filled containers," from loss or damage by fire originating from any cause except invasion. We do not have to go outside of our own Minnesota authorities to find support for the proposition that the property insured need not have been physically damaged by fire to permit a recovery on the policies. It is well-established law in this state that fire insurance includes loss proximately resulting from fire although the fire itself does no injury to the object insured. In fact this court said in Ermentrout v. Girard Fire & Marine Ins. Co. 63 Minn. 305, 308, 65 N. W. 635, 636, 30 L. R. A. 346, that the law in that regard "is so well settled that the citation of authorities in support of the proposition is unnecessary." See, Russell v. German Fire Ins. Co. 100 Minn. 528, 111 N. W. 400, 10 L.R.A. (N.S.) 326; Mork v. Eureka-Security Fire & Marine Ins. Co. 230 Minn. 382, 42 N. W. (2d) 33, 28 A. L. R. (2d) 987; Lipshultz v. General Ins. Co. 256 Minn. 7, 96 N. W. (2d) 880.

In the Lipshultz case it has been made clear that this court has refused to restrict coverage in situations in which the peril insured against set in motion a chain of events originating on the premises of the insured or on premises immediately adjoining. It was held there that the word "direct" in the policy meant merely "immediate" or "proximate" as distinguished from remote, and the court further said

that there is in the policy no limitation of coverage excluding this type of loss—one which the insurers might have inserted by an appropriate exclusionary clause.

■ In the Mork case this court said (230 Minn. 387, 42 N. W. [2d] 36):

"* * * The contract here involved must be considered from the standpoint of the parties at the time of its execution, in the light of surrounding circumstances, as was stated in the Russell case. When this contract was entered into, it could reasonably have been foreseen that, if in freezing weather the furnace were put out of commission by an explosion and the heat supply thus cut off, the water in the heating and plumbing systems would freeze and burst the pipes. It is reasonable to say that the parties contracted with reference to the contingency of an explosion in the furnace, with a resulting stoppage of heat. If they contracted with reference to such a contingency, did they not also contract with reference to what inevitably must follow such an explosion if it occurs in subzero weather?"

Similar language was used in the Russell case where it was said (100 Minn. 535, 111 N. W. 403):

"To render the fire the immediate or proximate cause of the loss or damage, it is not necessary that any part of the insured property actually ignited or was consumed by fire."

■ We quote the following from 5 Couch, Cyclopedia of Insurance Law, § 1201, p. 4398:

"Whatever may be held to be the meaning of the word 'fire' in any particular case before the court, a policy insuring against losses by fire will cover every loss, damage, or injury to the insured property of which 'fire' is the proximate cause. It includes every loss necessarily following from the occurrence of a fire, if it arises directly and immediately from the peril, or necessarily from judicially admissible and surrounding circumstances, the operation and influence of which could not be avoided. It is not necessary that the identical property, or even any part of it, be consumed, or burned, or even ignited."

We now come to the crux of the situation in the instant case. If the

parties contracted with reference to the contingency of a fire occurring in or near the plant of the Marshall Produce Company during the performance of a contract for the Quartermaster Corps, did they not also contract with reference to what inevitably must follow such a fire as occurred if smoke therefrom filled the building—rejection of all products in the plant by the government inspector?

The facts are inescapable that a fire occurred as set forth in the record; that as a result of the fire smoke penetrated plaintiff's plant filling it with smoke-laden air due to which plaintiff suffered a loss. Plaintiff carried insurance in the defendant companies covering all loss or damage by fire.

Clearly it is not necessary that the fire occur in the insured's buildings. The presence of smoke from a fire, anywhere in the immediate neighborhood, resulting in smoke penetrating the building and depositing smoke-laden air in the building is enough. The question naturally follows: Was there loss or damage by fire within the coverage of the policy provisions?

In the case of Jiannetti v. National Fire Ins. Co. 277 Mass. 434, 438, 178 N. E. 640, 642, the court said:

"* * * It manifestly was not the intention of the parties to policies that the property covered by the terms of the insurance contract must be itself on fire, *since losses by smoke and water where the fire has not touched the object injured are familiar to all*; and it is clear that it was their intention that any loss sustained by the plaintiff by fire, in the ordinary acceptance of that term, should be covered by the policies, *provided the plaintiff should prove that the loss sustained, whatever its form, was proximately caused by fire.* And 'When it is said that the cause to be sought is the direct and proximate cause, it is not meant that the cause or agency which is nearest in time or place to the result is necessarily to be chosen. * * * *The active efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source is the direct and proximate cause.*' [Case cited.]

"* * * In the absence of authorization by statute, it is not legally

possible for a jury to return a verdict for the plaintiff upon one item of alleged damage, and for the defendant upon another and distinct item of damage, *both items being referable to the same cause of action.*" (Italics supplied.)

Whatever the loss may have been, it is obvious that the fire was the proximate cause of the loss; that smoke and its resulting foul odors spread into the plant and its contents, which led the government officials to do what they might well be expected to do under the prevailing conditions; namely, to reject the merchandise and render the same valueless. It is not persuasive under all the circumstances to argue that the possibility was not at all times known to the insurance companies, or ought not to have been known to them, since they were from the inception of the policies aware of the fact that the plaintiff insured was processing eggs into powder under government contract. The Minnesota form of standard policy does not require as the cases indicate that the fire be the "direct" cause of the loss or damage, as does the so-called "New York form."

■ It must be assumed that the insurance companies here surveyed the properties which they insured. We fail to note any defense of substance that they were not familiar with the nature of the property, the purpose of its manufacture, its ordinary use, the use to which it was to be put, and the manner in which it was to be kept and in fact was kept. Cement, Sand & Gravel Co. v. Agricultural Ins. Co. 225 Minn. 211, 30 N. W. (2d) 341, speaks with authority as to the issues thus involved. The defendant insurance companies were charged with knowledge of certain regulations that governed the output of the egg powder in the instant case. The contract with the Quartermaster Corps set forth certain sanitary requirements which had been established by the regulations of the U. S. Department of Agriculture and which provided that plaintiff plants must at all times be free of strong foul odors and smoke-laden air. The regulations, published in the Federal Register of March 29, 1955, have the force of law and command judicial notice. See, 44 USCA, § 301, et seq.; Billings v. Truesdell, 321 U. S. 542, 64 S. Ct. 737, 88 L. ed. 917.

In Larkin v. Glens Falls Ins. Co. 80 Minn. 527, 83 N. W. 409, it

was held that a contract of insurance upon property within fire limits of a city is presumed to have been entered into with reference to the ordinances of such city on the subject of alteration and repair of buildings damaged by fire to the extent of 50 percent of their value. This court said that there can be no question as to the authority of the city to enact the ordinances in question; that they are in the interests of the public welfare and within the police power, and we adopted the view that they become an integral part of all contracts of insurance upon property within the fire limits to which they apply. It was held there that by the refusal of the inspector to permit the insured to repair the building damaged by fire, his loss was total. The court said in the Larkin case that (80 Minn. 531, 83 N. W. 410):

"* * * These authorities lay down the rule that such ordinances are a part of the contract of insurance, and that the insurer is bound thereby. This is in line with the general doctrine that, where parties contract upon a subject which is surrounded by statutory limitations and requirements, they are presumed to have entered into their engagements with reference to such statute, and the same enters into and becomes a part of the contract. There would seem to be no logical reason why this general rule should not apply to a case of this kind. The parties are presumed to know of the ordinances. They directly and materially affect their rights in case of a loss under the policy, and should govern and control in the adjustment and settlement of such loss."

In Zalk & Josephs Realty Co. v. Stuyvesant Ins. Co. 191 Minn. 60, 68, 253 N. W. 8, 13, involving the application of an ordinance in reference to frame buildings located within the fire limits of a city, plaintiffs were allowed to recover on their fire insurance policy as for a total loss of the building; the court said:

"The action of an administrative officer, under the police power of a state or city, is not final and need not necessarily require notice before action is taken or an order made, unless required by statute or ordinance. An opportunity to be heard and to contest the order or action must be given, but need not be given in express terms or in the same law or ordinance. Due process of law is satisfied when an op-

portunity is afforded to invoke the equal protection of the law by judicial proceedings appropriate for the purpose and adequate to secure the end and object sought to be obtained. The defendant in this case had the right to appeal to the city council, to bring suit for injunction or other appropriate remedy, or to wait, as it did, until action was brought against it on its policy and defend on all grounds that it could have raised at a hearing. This affords due process of law."

The plaintiff in the instant case did not appeal from the decision of the Quartermaster Corps to reject the canned egg powder. Although the defendants were in constant touch with the plaintiff through representatives and adjusters for a period of 2 weeks following the fire, they did not appeal from or insist upon the plaintiff appealing from the rejection order. They did not insist upon taking over to effect the best results in salvage. Mr. Peters, their adjuster, could not make up his mind what to do. Upon their own they finally decided to leave the disposition of the damaged property to the plaintiff to effect the best it could in salvage. The defendant companies chose to pursue their own course and seek their own appropriate remedy by waiting until action was brought against them on their policies and then defend on all the grounds that they could have raised at any prior available hearing. Upon the record as it stands, the defendants have no preferred vantage ground from which to criticize the plaintiff on any loss reduction he may have been able to effect through salvage.

As the record stands the sanitary regulations in the instant case were as much a part of the law as were the ordinances considered in the Larkin and Zalk cases. Defendants were charged with knowledge of their contents and their effect. They knew for what purposes the eggs were being processed and that if a fire loss should occur the resulting loss or damage might be large and that as fire or smoke got into the plant it could well cause a severe loss to the plaintiff, not only as to products physically affected by fire or smoke but also as to products exposed to either fire or smoke and which by reason of rejection by inspectors and the Quartermaster Corps might become valueless and result in total loss. Such risks were known to defendants when they issued their policies. It was held by this court in Hartley v. Pennsylvania

Fire Ins. Co. 91 Minn. 382, 98 N. W. 198, that insurance companies writing policies with full knowledge of the risk assumed, cannot defend on the ground that the existence of this risk relieved them from liability.

■ The fire might have occurred in the instant case when the plant was stripped of merchandise due to completed shipments. Unfortunately, the fire occurred when the merchandise was stored in the plant. The amount of the insurance carried would indicate that the parties to the insurance contract had in mind that at times the plaintiff would have a large amount of merchandise on hand and stored in the plant and they were therefore written in such sums as would be large enough to cover the larger and more unfortunate loss. The plaintiff had paid the required premiums for high coverage in order to be amply protected. It is undisputed that there was a fire and the fire caused the loss. The loss to plaintiff or the loss in value to the insured goods, for there is coverage in both respects for all loss or damage to the insured goods, is as ascertainable under all the circumstances here involved as if the goods had been physically destroyed by the fire itself. Since plaintiff suffered a loss or damage, which is undisputed, under policies providing for all loss or damage to merchandise in the plant including filled containers by fire originating from any cause except invasion, it is difficult to conjure up any logical reason why that loss or damage should under all the circumstances be excluded from coverage under the policies in question. The cases are numerous which have considered smoke and soot to be proper elements of recovery when produced by a fire, and this result has been held proper even when the smoke came from a fire upon adjacent premises. The decisions involving loss under fire insurance policies in this state can lead to no other conclusion, Larkin v. Glens Falls Ins. Co. *supra*; Zalk & Josephs Realty Co. v. Stuyvesant Ins. Co. *supra.*

Depreciation in value was recognized as a loss in Christison v. St. Paul Fire & Marine Ins. Co. 138 Minn. 51, 163 N. W. 980, L.R.A. 1917F, 612. It was held in Frank Palmer & Sons v. Lumber Mutual Fire Ins. Co. 100 N. Y. S. (2d) 988, that where there was a partial destruction of plaintiff's stock of raw materials, *plaintiff would be en-*

*titled to recover for the loss in value of undamaged materials if it could show that these materials in process of manufacture were rendered unusable, or in danger of becoming unusable, although not physically damaged by fire.*

Other decisions of the courts of other states are illustrative and of aid in passing upon questions here involved. Lynn Gas & Elec. Co. v. Meriden Ins. Co. 158 Mass. 570, 33 N. E. 690, 20 L.R.A. 297; Queen Ins. Co. v. Patterson Drug Co. 73 Fla. 665, 74 So. 807, L.R.A. 1917D, 1091; Hall v. Great American Ins. Co. 217 Iowa 1005, 252 N. W. 763; Princess Garment Co. v. Fireman's Fund Ins. Co. (6 Cir.) 115 F. (2d) 380; Delametter v. Home Ins. Co. 233 Mo. App. 645, 126 S. W. (2d) 262; Springfield Fire & Marine Ins. Co. v. Shapoff, 179 Ky. 804, 201 S. W. 1116. In the Springfield case the policies insured against "all loss or damage by fire." A considerable amount of the property was not destroyed. The Kentucky court, however, said (179 . Ky. 810, 201 S. W. 1118):

"The distinction may well be recognized that a total loss may not mean a total destruction or consumption. In other words *a total loss to the insured may mean only that the stock of goods is rendered valueless even though a considerable bulk thereof remain intact.*" (Italics supplied.)[1]

■ It was held in Hauenstein v. St. Paul-Mercury Ind. Co. 242 Minn. 354, 65 N. W. (2d) 122, that the measure of damages can be and often is the diminution in the market value depending of course upon the provisions of the insurance contract. The principle here involved where defendants have insured the merchandise in the plant, including filled containers, against all loss or damage by fire, is somewhat illustrated by the Minnesota case of Heath v. Minneapolis, St. P. & S. S. M. Ry. Co. 126 Minn. 470, 148 N. W. 311, L. R. A. 1916E, 977, where large quantities of sand had been deposited on plaintiff's land. Plaintiff's property had not been intrinsically damaged, but the external deposit of sand impaired the value of the land as long as

---

[1]Also see, Northwestern Mutual Life Ins. Co. v. Sun Ins. Office, 85 Minn. 65, 88 N. W. 272; Northwestern Mutual Life Ins. Co. v. Rochester German Ins. Co. 85 Minn. 48, 88 N. W. 265, 56 L. R. A. 108.

its presence remained. (The presence of smoke-laden air and its resulting deposit and penetration into plaintiff's merchandise impaired the value thereof in the instant case.) This court said that this was property damage for which recovery could be had, to be measured by the diminution in value of the land, or by the loss of use plus the cost of removal of the sand, whichever was less. That a deterioration in the market value of the filled containers of egg powder followed from the fire in the instant case was conceded by defendants' expert witness Schneider. In view of the broad policy provisions to which the market value clause was added as an endorsement, it must be apparent that where there was loss or damage resulting from fire causing the government's rejection of the merchandise in the instant case, the insured is entitled to be put in as good a financial condition with regard to the merchandise involved as he was before the fire occurred. It was not necessary that plaintiff's merchandise be intrinsically damaged so long as its value was impaired in order to support a claim for either loss or property damage here. Since the government's rejection of the cans of military powder was binding on the plaintiff, it ought, upon this record and under the circumstances here controlling, to be equally binding on the defendants, as plaintiff's insurers. True, plaintiff had the burden of proving "all loss or damage by fire." The defendants, however, have not shown by any competent or substantial evidence in this record that the government, in exercising the right of rejection, abused its discretion in determining the course it chose to pursue. Here, authorized government representatives rejected the merchandise in question as unacceptable and therefore unusable. There is nothing in the record of any substantial character indicating that the authorized government officials were not warranted in their determination to exercise their rights under contract requirements and fulfilling the governmental duties imposed upon them in doing so. True, the defense argues that the action taken by the government officials is not proof of damage in any degree. But the policies insured the merchandise against loss or damage by fire and also specifically insured the plaintiff and its legal representatives against all loss or damage by fire. The defendants say in discussing cases cited by plaintiff that the

issue in the instant case is not whether the department of agriculture acted properly. They say "We do not challenge their action; that is not in our power." They say that plaintiff's citations merely go to show that only a presumption exists that they did act in accordance with regulations.

Defendants pin their hopes on the claim that Edwin J. Bendt-schneider and Frank J. Santo, representing the government, acted only on the "presence" of smoke and not of damage. It seems clear to us from the record that they acted pursuant to regulations and contract provisions and that their action in that respect completed the cause of all loss or damage either to the plaintiff personally or to the merchandise pursuant to policy provisions causing it to become totally unacceptable for the military purposes for which it was designed, valueless and almost totally worthless on any available market.

A search of the cases would disclose that the facts in the instant case enter a new field as to products involved and standards under which they are manufactured; that is, standards of sanitation and cleanliness which have been promulgated by government concerning food for human consumption. These standards conform to demands of the public and thus lawmakers have outlawed practices which were commonplace heretofore. No longer is it merely a question of whether food is fit for human consumption; but also whether it is processed under sanitary, dust and smoke-free conditions. The law of insurance must march along and it must meet changing conditions and standards. Standards of sanitation and regulations having the force of law were controlling factors in the instant case and the defendants, upon the record, stand charged with knowledge of their contents and their intended effect.[2] Because there is no parallel case cited upon similar facts they alone should not incline the court to deny recovery.

We have here a situation where the plaintiff because of fire has suffered a large monetary loss in respect of property for insurance of which plaintiff has paid substantial premiums. So far as the record discloses the loss is slightly less severe and no less real to the plaintiff than it would have been had the property been directly consumed

---

[2]See, M. S. A. 31.28 and 29.06.

by fire. The defendants seek escape on the ground that they should be excused from making good all loss by fire to merchandise in the plant, including filled containers, because the inner contents of the cans involved may not have been damaged physically and on the further ground that to some people it looked the same while to other people who testified it did not smell the same and it did not taste the same. Any claim made by the defense as to the condition of the contents of the cans, according to their top proof, places the contents, at best, only at a minimum marginal basis. The plain overall fact as disclosed by the record is that plaintiff has suffered practically total loss by fire. The question is now whether it must upon this record bear its own expense and be denied the right to recover under the protection it paid for. It is not unreasonable to assume that the peril here involved was well within the contemplation of both insurer and insured when formulating the terms and provisions in the insurance contracts and that therefore taking into account the contention of the defendants and the view adopted by the trial court that "The egg powder in cans was not damaged by fire," the result thus arrived at constituted entirely too narrow a construction. The fact cannot be ignored that all loss and damage in the instant case came from the same source and the same cause. The contention of the defense incidentally ignores a fundamental tenet in the construction of insurance policies which is to the effect that if a policy of insurance is so drawn as to require interpretation and be susceptible of two different constructions the one will be adopted which is most favorable to the insured.[3]

We have held repeatedly that where the language of the insurance policy is that selected by the insurer, any doubt as to its meaning must be resolved in favor of the insured, for a policy of insurance, like any other contract, is to be construed so as to give effect to the intention of the parties as that appears from a consideration of the entire instrument.

---

[3]See, Allied Mutual Cas. Co. v. Askerud, 254 Minn. 156, 94 N. W. (2d) 534; Cement, Sand & Gravel Co. v. Agricultural Ins. Co. 225 Minn. 211, 30 N. W. (2d) 341; Jordan v. Iowa Mutual Tornado Ins. Co. 151 Iowa 73, 130 N. W. 177.

In the instant case plaintiff's merchandise after manufacture and until shipped had been regularly and ordinarily stored and kept within the Marshall plant. All facts as to required sanitary standards, sanitary requirements, and the possibility of rejection by the government were known to and within the contemplation of the parties and should have been known to the insurers or their agents, taking into account the broad and complete terms and provisions of the policies and all such implied provisions as are indispensable to effectuate the intention of the parties and such as arise from the language of the contracts and the circumstances under which they were made. Would the court, upon the record herein, be justified in construing the policy terms with such precision that the obvious purpose for which the insurance was obtained must in part be defeated? We incline not to think so. Insurance companies make it a practice and they do survey the property which they insure. They should not later, therefore, be heard to say that they were not familiar with its nature, its ordinary use, and the manner in which it was to be processed, stored, or kept.[4]

We have said that the intent of the contracting parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the insurance contract as a whole.[5]

■ It needs no further citation to support the statement that there is a well-established line of authorities in this country holding that where a stock of merchandise is partially destroyed or physically damaged by fire, and as a result, the balance of the merchandise is made valueless from a practical standpoint, the insurer is liable as for a total loss of all the property.

In the instant case the trial court found that the milk powder, the shell eggs, and the egg powder in drums had sustained loss and damage by fire. The record discloses that the egg powder in cans and in

---

[4] See, Northwestern Fuel Co. v. Boston Ins. Co. 131 Minn. 19, 154 N. W. 515; Elliott v. Retail Hdwe. Mutual Fire Ins. Co. 183 Minn. 556, 237 N. W. 421; Cement, Sand & Gravel Co. v. Agricultural Ins. Co. *supra.*

[5] Cement, Sand & Gravel Co. v. Agricultural Ins. Co. *supra.*

the packaged form prepared for shipment (military egg powder) had lost its market value through the right of rejection exercised by the Quartermaster Corps and thereby, except for net deductions including salvage in the amount of $1,168.20, rendered valueless in toto. The policies provided coverage for all loss or damage.

▪ It is patently clear that in the instant case any and all loss or damage came from the same cause. See, Jiannetti v. National Fire Ins. Co. 277 Mass. 434, 178 N. E. 640.

▪ The military egg powder in cans was packed and stored pursuant to specific sanitary regulations promulgated by the department of agriculture and made a part of the contract, and these sanitary regulations provided in express terms that processing and storing of eggs and egg products must be done in an area free from odors, dust, and smoke-laden air. The best explanation with regard to these requirements is the fact that eggs and egg products are highly susceptible to contamination from these sources. An inspector stationed at the plant arrived shortly after the fire and examined the packaging around the cans. He found smoke contamination, a very strong odor from the smoke throughout the package and around the border of the package. He does not claim to have tested the powder itself, but it is clear that he regarded it as possible that the contents could be actually physically contaminated. No doubt his decision to reject the merchandise was in part based on contamination to the containers and the package. The local inspector consulted the higher ups at Des Moines and Washington and they concurred in the decision to reject. The Federal supervisor, Santo of Des Moines, did not visit the plant the day of the fire but only later at a time when efforts were being made to obtain a reversal or a moderation of the decision. He testified that he could still detect a smoky odor and expressed the opinion that the smoky odor was absorbed by "packaging material, fillers and flats" and that the odor "was in the packaging material, which had absorbed the smoke." A department of agriculture supervisor by the name of Berlin H. Rorem visited the plant on March 14, and his testimony is to the effect that he found a "smoke odor on the cases." The record shows that on March 14, the day after the fire, plaintiff was notified by the Quartermaster Corps that it "would have no need for the pow-

der due to the contamination of smoke." This was followed by the official orders of rejection which have been set forth in the record. The reasons for the rejection have been explained by U. S. Q. M. C. purchasing agent Bendtschneider and we quote as follows from his testimony:

"A.   A container, which in this instance was an export container, is not air proof and therefore the smoke would penetrate into the cans and the egg powder, a very highly susceptible to any type of odor due to opening or anything, it wasn't even desired to consider that the cans be removed, washed in any way, shape or form to relieve this smoke condition. The product also was being stored for a period of several months before its usage and would have *a tendency possibly to contaminate other commodities with which it would be stored at the depots or any facilities which it might be stored at for this egg powder.*

"Q.   Well, was your reason for rejecting the shipment the penetration of smoke into the cases as you have just stated or the fact that the product was being processed at a time when smoke was in the plant, or both reasons?

"A.   I would say it covered both reasons.

"Q.   Was that conclusion based upon your conversations with Mr. Santo and Mr. Somstegard in the reports that you received?

"A.   No, fire or smoke or anything that would be existent in any plant during its manufacture of egg powder is considered a very major defect and in the terms and conditions of the contract is immediately rejected. There is no recourse in the matter.

"Q.   Even though the egg powder might stand up on an analysis and show that it was not actually damaged by the smoke?

"A.   We wouldn't accept it under any conditions where smoke or fire had been even close to it.

"Q.   Why is that, Mr. Bendtschneider?

"A.   Due to the egg powder being very susceptible to take on odors and taste and so forth, because the egg powder has to be reconstituted for human consumption and any smoke or any taint of smoke would make it very distasteful and would not be acceptable.

\*     \*     \*     \*     \*

"* * * In other words, not only powdered eggs but any non-perishable item where fire would be involved, the contamination of smoke would penetrate any fiber box or get on the outside of the can, regardless of what the commodity would be." (Italics supplied.)

There is testimony in the record to the effect that even though the odor leaves no deposit that can be seen, it does leave a bad smell that will persist for long periods of time and that this odor definitely got into the containers, if not yet physically present in the powder itself, and hence the rejection by the government. There is proof without question that the government would not have accepted the egg powder, even though it were reprocessed, and repacked. Again we refer to the fact that in the policies it is provided, that the merchandise in the plant shall be covered "including filled containers." Therefore, we must conclude that the cans, labels, and cases are as much a part of the product as the contents; that the entire unit is the property which is insured, and which plaintiff was under contract to deliver to the government free from smoke contamination. Under the circumstances the right of the Quartermaster Corps to reject the merchandise including the egg powder packed within the cans, because of contamination to the containers, can hardly be seriously questioned. It is common knowledge that canned and bottled goods may sustain physical damage and loss in value because of damage to the container, even though the contents may not be physically affected, and every storekeeper knows that merchandise which carries even a slight odor of smoke after a fire, or bears ever so slight a discoloration, is damaged merchandise. This exists as a fact, even though a simple washing may, in the judgment of many people, effect a complete restoration. When merchandise loses its market value "loss or damage" has occurred and, if the soiling, discoloration or odor has been caused by a fire, it can hardly be seriously denied that the fire first caused the loss.

The trial court's finding that "The egg powder in cans was not damaged by fire," is hardly consistent with its previous finding that plaintiff sustained loss and damage to other products, and it is not based, as of necessity it must be, upon the whole of the provisions of the insurance contracts which insured against all loss or damage by fire to

the merchandise in the plant "including filled containers" and insuring plaintiff and the merchandise therein described against similar loss. Clearly the fire occurred; there were losses and damage resulting from the fire; and there were in existence policies specially written to apply to and cover plaintiff's operations, in effect covering all loss or damage by fire at the Marshall plant.

In respect to the completed official transactions involved in the case at bar, it will be presumed, in the absence of an affirmative showing to the contrary, that the rejecting officers have performed their duties in connection herewith at the time and in the manner and form required by law. The burden to overcome that presumption rests with the party alleging to the contrary. Certainly the plaintiff has with the aid of this presumption carried its burden of proof as the record now stands. It will remain conclusive unless there is a showing by defendants negativing the existence of any fact or facts that sustain the determination of the U. S. Quartermaster Corps. The defendant companies would be required to show that the rejection by the Quartermaster Corps was a clear abuse of discretion, and this the defendants have not done. See, 7 Dunnell, Dig. (3 ed.) § 3435. Clearly the Quartermaster Corps determined that the merchandise—the filled containers—suffered smoke contamination to the extent of becoming unfit for the purposes for which it had been manufactured and packed. The so-called "disputes" clause of the contract with plaintiff provides that such decision is final in so far as questions of fact are concerned.

The defendant companies did not request an appeal after the government decision had been rendered. If the decision of the Federal officers was conclusively binding upon the plaintiff, it must of necessity be equally binding upon the insurance companies under the terms of the policies. The determination of contamination; that is, actual physical damage to the military egg powder, was made by an administrative agency of the United States. The power exercised was a power conferred on the agency by the Constitution and laws of the United States. The law would therefore presume not only that the determination itself was a valid determination, but also that necessary facts were in existence to support it. A very similar official determination was

made by this court in cases which we have heretofore referred to; namely, Larkin v. Glens Falls Ins. Co. *supra*; Zalk & Josephs Realty Co. v. Stuyvesant Ins. Co. *supra*.

While in those cases the ordinances under which the officers acted did not provide that the decision of the officer should be final and conclusive, such as the language of the contract in the case at bar, and the court in those cases did not definitely dispose of the question of whether or not the decision under the ordinances was as a matter of law final, but this court held in those cases that the decisions could be disturbed only on "very clear grounds," and that the burden was on the defendant companies to impeach it.

In Pacific States Co. v. White, 296 U. S. 176, 56 S. Ct. 159, 80 L. ed. 138, it was urged that the rebuttable presumption of the existence of a state of facts sufficient to justify the exertion of the police power attaches only to legislation and that therefore where the regulation is an act of an administrative body no such presumption exists, so that the burden of proving the justifying facts is upon the one who seeks to sustain the validity of the regulation. The court held in that case that such contention is without support in authority or reason and that it rests upon misconception. The court went on to state that the exertion of the police power, either by the legislature or by an administrative body, is an exercise of delegated power, and that where it is by a statute, the legislature has acted under power delegated to it through the Constitution; that where the regulation is by order of an administrative body, that body acts under a delegation from the legislature. The court said that the question of law may, of course, always be raised whether the legislature had power to delegate the authority exercised, but that where the regulation is within the scope of authority legally delegated, the presumption of the existence of facts justifying its specific exercise attaches alike to statutes, to municipal ordinances, and to orders of administrative bodies, citing the following cases: Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. ed. 446; Schechter Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. 1570, 97 A. L. R. 947; Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 72 L. ed. 357.

Ingelson v. Olson, 199 Minn. 422, 272 N. W. 270, 110 A. L. R. 167, holds that public bodies and officers are presumed to do their duty and act within the limits of their power, and this presumption operates to sustain the legality of their acts until the contrary is shown. 7 Dunnell, Dig. (3 ed.) §§ 3433, 3436. This court in the Ingelson case said that although the power to act depends upon the existence of some preliminary fact, it must be presumed, if the contract is made, that the fact existed. The existence of facts of necessity, giving validity to the acts of the body, will be presumed the same as any other fact. Also see, Goener v. Woll, 26 Minn. 154, 2 N. W. 163.

The law presumes, as our decisions indicate, that the underlying facts were such in the instant case that the Quartermaster Corps finds support therein for its determination. This presumption existing, the plaintiff herein carried its burden of proof, and that remains conclusive, unless the defendant companies have at the very least introduced evidence clearly negativing the existence of any fact or facts that could possibly support the determination of the Quartermaster Corps. See, 7 Dunnell, Dig. (3 ed.) § 3435. The defendant companies did introduce evidence tending to show that the contents of a few cans had suffered no physical damage—that is, the egg powder packed within the cans—but the contents of these cans at the time met only minimum marginal standards of palatibility.

The evidence on the part of the defense does not show that the cans and cases were whole and sound and free from contamination and smoky effects or that labels and containers might not thereafter have adversely affected other goods with which they might be mingled and stored in distant places in the future by the military authorities. The defendants have not shown that there was no physical damage whatsoever to this merchandise "including filled containers."

■ The defendants have cited three cases as controlling; one of those involving the issue of interest. The case upon which they place the greatest reliance is North River Ins. Co. v. Clark (9 Cir.) 80 F. (2d) 202. We find this case distinguishable. A locomotive was involved. A bridge had been burned and there was testimony that it would cost more to rebuild the bridge to bring the locomotive back from

where it was isolated than its value. The locomotive, however, was not damaged physically by the fire to which it had been exposed. It was claimed that although there may have been an economic loss to the plaintiff there was no loss within the meaning of the policy and that in any event the fire was not the proximate cause of the loss. It appears that the basis for the contention that there was no actual loss of the locomotive would seem to be that the locomotive was capable of being recovered. The trial court held that the locomotive was rendered valueless by the fire. This decision was reversed by the circuit court of appeals. The decision of the lower court, however, was viewed in 48 Harv. L. Rev. 1027 as follows:

"Unique in allowing recovery for undamaged property, the decision appears sound, nevertheless, *since fire insurance includes loss proximately resulting from fire which itself does no injury to the object insured.*" (Italics supplied.)

A discussion in 20 Minn. L. Rev. 682 of the North River case suggesting that a contrary position to that taken by the court of appeals might be justified by analogy to the doctrine of constructive total loss in marine insurance whereby the insurer is held liable as for a total loss although the insured property is totally or partially uninjured if the expense of recovering or using the property exceeds its value. The comment goes on to state that a comparable principle is applied to fire insurance where there has been a partial destruction of the property so as to make repairs impractical or unlawful and that in such case the insurer is liable as for a total loss. The comment suggests: "There is no apparent reason why this principle should not be extended, in a proper case, to render the insurer liable for property totally uninjured but practically useless" and that the economic loss to the plaintiff in that case was as complete as if the locomotive had been physically destroyed. No doubt the comment in 20 Minn. L. Rev. 682 was written having in mind the conclusions reached by this court in Larkin v. Glens Falls Ins. Co. *supra,* and Zalk & Josephs Realty Co. v. Stuyvesant Ins. Co. *supra.*

It seems fair to say that if the defendants in the instant case contend that there is no liability on the same grounds which the North

River final decision might have been based, it is to be noted that whatever merit those grounds have in the North River case the defendants lack in the instant case. There is no possible way of recovering the lost eggs or egg powder and milk powder since their value is gone. The record shows to what extent an attempt participated in by one, at least, of defendants' adjusters to salvage the eggs was not successful. By the policies in the instant case the loss is covered unless words of exclusion are read into the contracts. Loss in market value is made the yardstick of the recovery therein. We think the loss in the case at bar was definitely one which the defendant companies might anticipate. It is clear that the fire was the proximate cause of any loss or damage sustained in the case at bar.

It is indisputable that in the instant case the fire involved set in motion a train of events which brought about the loss of which plaintiff complains, without the intervention of any force starting and working actively from a new and independent source.

Defendants also place reliance on Gates v. Prudential Ins. Co. 240 App. Div. 444, 270 N. Y. S. 282. This court held in Allied Mutual Cas. Co. v. Askerud, 254 Minn. 156, 94 N. W. (2d) 534, that insurance policies are construed strictly against insurance companies and not against the insured. Defendants cite Read & Traversy v. State Ins. Co. 103 Iowa 307, 72 N. W. 665, but it is distinguishable and not controlling in the instant case.

We have fully considered defendants' assignments of error. We think that the findings of the trial court in regard to the loss and damage by fire as to milk powder in drums, egg powder in drums, and shell eggs, find support in the evidence and they must stand.[6]

■ As we view it, the finding of the trial court to the effect that the egg powder in cans was not damaged by fire is not sustained by the evidence since the insurance coverage involved on plaintiff's appeal included coverage of all merchandise in the plant including filled containers and furthermore, the government requirements in its contract with the plaintiff reserve the right to reject in case of foul odors due to fire and resulting smoke-laden air. The contract in force in March

---

[6]See, Cyrus v. Cyrus, 242 Minn. 180, 64 N. W. (2d) 538, 45 A. L. R. (2d) 1002.

1956, as well as prior contracts requiring a high standard of sanitation in connection with the processing and constant supervision and inspection by inspectors of the United States Department of Agriculture provide for and authorize the rejection of merchandise if violation of sanitary requirements occurs, cannot be construed in the limited sense that the fire here did not cause a loss to or damage to the filled containers of egg powder to the extent that the right to reject was unjustified under the insurance policies and that the defendant must bear the loss even in the face of the market value clause placed as an endorsement upon the policies. If the authorized representatives of the government were justified in refusing to accept or make use of the smoke-laden merchandise as unfit for military use, the loss then would be total, subject to such deductions as the contract provides and net salvage recovered.

We reach the conclusion that the trial court's finding of loss and damage to the shell eggs and egg and milk powder in drums is adequately supported by the evidence and that plaintiff is entitled to interest thereon from July 10, 1956.[7]

We reach the conclusion that the plaintiff is entitled, additionally, to recover all loss on the merchandise in the plant described as cans of egg powder "including filled containers," the net loss after deductions and salvage shown to be $53,910. We therefore hold that the judgment should be affirmed on defendants' appeal but reversed on plaintiff's appeal with instructions to amend the judgment to include the amount of loss on the merchandise described as cans of egg powder "including filled containers," with interest thereon from July 10, 1956. The trial court is instructed to amend its findings of fact and conclusions of law so as to order judgment in favor of the plaintiff as herein indicated.

Affirmed on defendants' appeal, but reversed on plaintiff's appeal with instructions.

---

[7]See, Schrepfer v. Rockford Ins. Co. 77 Minn. 291, 79 N. W. 1005; H. F. Shepherdson Co. v. Central Fire Ins. Co. 220 Minn. 401, 19 N. W. (2d) 772; M. S. A. 65.011, subd. 2; Concordia Ins. Co. v. School Dist. 282 U. S. 545, 51 S. Ct. 275, 75 L. ed. 528; Annotation, 154 A. L. R. 1371; Perine v. Grand Lodge A.O.U.W. 51 Minn. 224, 53 N. W. 367.