PENTAIR, INC., Plaintiff—Appellant,

v.

AMERICAN GUARANTEE AND LIA-
BILITY INSURANCE COMPA-
NY, Defendant—Appellee.

No. 03–3236.

United States Court of Appeals,
Eighth Circuit.

Submitted: June 16, 2004.

Filed: March 11, 2005.

Alan L. Kildow, argued, Minneapolis, MN, for appellant.

David Bland, argued, Minneapolis, MN (Heather McNeff, on the brief), for appellee.

Before LOKEN, Chief Judge, JOHN R. GIBSON and BYE, Circuit Judges.

LOKEN, Chief Judge.

An earthquake struck Taiwan in September 1999, disabling a substation that provided electric power to two Taiwanese factories. Lacking power, the factories could not manufacture products they were supplying to a subsidiary of Pentair, Inc. When production resumed two weeks later, Pentair shipped orders from Taiwan via airfreight to meet its customers' needs for the Christmas season, resulting in additional costs of $634,731. Pentair filed a claim for this loss under the "Contingent Time Element" provision of the all-risk manuscript property insurance policy issued to Pentair by American Guarantee and Liability Insurance Company. American Guarantee denied coverage, and Pentair commenced this diversity action. The district court[1] granted American Guarantee's motion for summary judgment. *Pentair Inc. v. Am. Guar. & Liab. Ins. Co.*, 2003 WL 21804874 (D.Minn.2003). Pentair appeals. Applying Minnesota law, like the district court, and reviewing the grant of summary judgment *de novo*, we affirm.

Section 10(a)(1) of the American Guarantee policy provided that the policy insures "all real and personal property ... owned, used, or intended for use by" Pentair. Section 11 provided that the policy covers "all risk of direct physical loss of or damage to property described herein." Section 10(d)(1) extended the policy's business interruption coverages[2] to extra expenses incurred by Pentair in order "to continue as nearly as practicable the normal operation of [Pentair's] business following loss ... by the perils insured herein" to property described in Section 10(a). The Taiwanese factories and their electric power supplier were not property described in Section 10(a). However, Pentair relies for coverage on Section 10(h)(2), the "Contingent Time Element" provision, which further extended the business interruption coverages to include losses incurred by Pentair as the result of "damage" to "property of a supplier of goods and/or services to the Insured" that is caused by a covered peril, here, an earth-

---

1. The HONORABLE DONOVAN W. FRANK, United States District Judge for the District of Minnesota.

2. In this type of policy, business interruption coverage is "secondary" or "consequential" in the sense that the coverage is triggered when a peril damages business property but compensates the insured for secondary consequences of the property damage. *See* 11 *Couch on Insurance, 3d* § 167:1 at p. 167–8 (1998).

quake.[3] Though few reported cases have construed this type of extended business interruption coverage, it has doubtless become more common and significant as companies increasingly out-source component parts manufacturing and rely on so-called "just in time" inventory systems.

The parties agree that the Taiwanese factories were Pentair suppliers located within a covered territory for purposes of Section 10(h)(2). The district court concluded that the "direct physical loss or damage" limitation in Section 11 applies to the contingent time element coverage in Section 10(h)(2). On appeal, Pentair does not challenge this conclusion. The district court then held that Pentair's extra expense loss is not covered under Section 10(h)(2) because (1) the electric substation, though physically damaged by the earthquake, was not a Pentair supplier for purposes of Section 10(h)(2); and (2) the resulting power outages did not cause direct physical loss or damage to the Taiwanese factory suppliers. On appeal, Pentair challenges both conclusions, arguing that the Taiwanese substation was a Pentair supplier within the meaning of Section 10(h)(2) and, in any event, its Taiwanese factory suppliers suffered "direct physical loss" when power outages rendered them unable to perform their "intended function" of manufacturing products for Pentair.

■ 1. We agree with the district court that the power substation was not "a supplier of goods and/or services" to Pentair within the plain meaning of Section 10(h)(2). Pentair relies on two cases holding that Midwest farmers who sold grain to a licensed grain dealer, which in turn resold grain to the insured, were suppliers of the insured for purposes of a policy's contingent business interruption coverage. Archer–Daniels–Midland Co. v. Phoenix, 936 F.Supp. 534 (S.D.Ill.1996), followed in Archer Daniels Midland Co. v. Aon Risk Services, Inc., 2002 WL 31185884 (D.Minn. 2002). Pentair draws an analogy between the Midwest farmers in the ADM cases and the electrical substation that serviced the Taiwanese factories in this case. But the analogy is inapt. In Phoenix, each farmer supplied a product (grain) that a dealer then resold to the insured, ADM. The court held that the policy covered business interruption losses to ADM caused by property damage to the farmers because the policy did not limit this coverage to suppliers in direct contractual privity with ADM. Phoenix, 936 F.Supp. at 544. Here, on the other hand, though the substation supplied power to the Taiwanese factories, the Taiwanese power company did not supply a product or service ultimately used by Pentair. Thus, it was not a Pentair supplier for purposes of Section 10(h)(2) because it supplied no goods or services to Pentair, directly or indirectly.

■ 2. The question whether Section 10(h)(2) covered the extra expenses incurred by Pentair because its Taiwanese suppliers suffered power outages is more difficult. Pentair initially argues that, under an all-risk policy, once it proves that a fortuitous loss occurred, American Guarantee must prove "that an express exception to the coverage applies." Pillsbury Co. v. Underwriters at Lloyd's, London, 705 F.Supp. 1396, 1399 (D.Minn.1989). However, while an all-risk policy simplifies the insured's burden to prove that a loss was caused by a covered peril, the insured must prove the loss was covered before the

**3.** The word "contingent" is something of a misnomer; it simply means that the insured's business interruption loss resulted from damage to a third party's property. The term

"time element" refers to business interruption losses, including extra expenses incurred, as defined in other policy provisions.

burden shifts to the insurer to prove that coverage is barred by a policy exclusion. *See Witcher Const. Co. v. St. Paul Fire & Marine Ins. Co.*, 550 N.W.2d .1, 4 (Minn. App.1996). Here, the extra expense loss was no doubt fortuitous, but the issue is whether it fell within the Contingent Time Element coverage provided by Section 10(h)(2). The district court concluded that Pentair failed to prove coverage because the power outages caused no injury to the Taiwanese factories other than a shutdown of manufacturing operations, and this did not constitute "direct physical loss or damage" to a supplier's property within the meaning of Section 10(h)(2) as limited by Section 11.

■ On appeal, Pentair argues that its Taiwanese suppliers' inability to function after the loss of power constituted direct physical loss or damage. Pentair cites no case holding that mere loss of use or function constitutes "direct physical loss or damage" within the meaning of a provision like Section 11 of the American Guarantee policy. . Pentair relies on two Minnesota Court of Appeals opinions that emphasized the functional impairment of insured property in concluding that the insureds had established "direct physical loss." *Sentinel Mgt. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn.App.1997), *followed in General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn.App.2001). But in those cases, insured property was physically contaminated—a building by the release of asbestos fibers in *Sentinel*, and grain by application of an unapproved pesticide in *General Mills*. Once physical loss or damage is established, loss of use or function is certainly relevant in determining the amount of loss, particularly a business interruption loss. But Pentair's argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its

intended purpose. The Minnesota Court of Appeals has not read *Sentinel* so broadly. *See Rest Assured, Inc. v. Amer. Motorist Ins. Co.*, 1999 WL 431112 (Minn. App.1999). Nor, in .our view, would the Supreme Court of Minnesota. *See Marshall Produce Co. v. St.. Paul Fire & Marine Ins. Co.*, 256 Minn. 404, 98 N.W.2d 280, 297 (1959). Thus, although electric power has a "physical" element, the district court's construction is consistent with the plain language of Section 11 of the policy.

Though the parties framed the coverage issue in terms of Section 10(h)(2) as limited by Section 11 and cases construing the term direct physical loss or damage, we conclude that these are not the only relevant policy provisions. The loss to Pentair resulted from a .power outage. In this age of massive electric power grids, occasional catastrophic blackouts, and broad business interruption coverages, we would expect the subject of power outage losses to be explicitly addressed in cases construing all-risk policies, and perhaps in the policies themselves. Surprisingly, we found no reported case addressing whether a loss of power by itself constitutes property damage. But a few courts, including the Supreme Court of Minnesota, have addressed whether a loss of power that causes other damage to the insured's property results in a covered loss. In *Lipshultz v. General Insurance Co. of America*, 256 Minn. 7, 96 N.W.2d 880 (1959), the Court concluded that a storm-caused power outage that resulted in spoilage of the insured's perishable food inventory fell within a policy covering "direct" losses by windstorm. Noting that the storm damaged power lines supplying a nearby power substation as well as other lines directly supplying the insured's store, the Court held that the property damage to the insured's inventory was covered because "the word 'direct' as used in said

policies means merely 'immediate' or 'proximate,' as distinguished from 'remote.'" 96 N.W.2d at 886.

*Lipshultz* is not directly relevant to this case because it involved coverage of physical property damage, not coverage of a business interruption loss. Closer to the mark is *American Guarantee & Liability Insurance Co. v. Ingram Micro, Inc.,* 2000 WL 726789, at *2–3 (D.Ariz.2000), where a power outage rendered the insured's computers unusable until they were reprogrammed. The court held that the policy's business interruption coverage applied because there was "direct physical loss or damage" to the computers. But *Ingram* again involved a power outage that damaged other property. It does not support the broader proposition that a power outage alone constitutes physical loss or damage to property.

Presumably in response to cases like *Lipshultz* and *Ingram,* some insurance policies have included an off-premises services exclusion to eliminate coverage for property and business interruption losses caused by power outages. This exclusion has met with mixed success in the courts. *Compare Pressman v. Aetna Cas. & Sur. Co.,* 574 A.2d 757 (R.I.1990) (finding coverage because the exclusion was deemed ambiguous), *with Lakes' Byron Store, Inc. v. Auto–Owners Ins. Co.,* 589 N.W.2d 608 (S.D.1999), *and Mapletown Foods, Inc. v. Motorists Mut. Ins. Co.,* 104 Ohio App.3d 345, 662 N.E.2d 48 (Ohio App.1995) (applying off-premises services exclusion to deny coverage for losses from power outage). Of significance for our purposes, these decisions only discussed whether the exclusion applied. The courts—and presumably the insurance company parties to the coverage lawsuits—apparently assumed that business interruption losses due to a power outage would otherwise be covered.

With this case law on the landscape, the parties to a large all-risk manuscript policy covering property and business interruption losses might sensibly decide to explicitly cover the foreseeable question of whether and to what extent the policy will cover losses caused by power failures resulting from covered perils such as an earthquake, rather than relying on a court to resolve this issue applying the direct-physical-loss-or-damage limitation in Section 11. And in fact, the parties to the American Guarantee policy did address the issue. The second sentence of Section 24 of the policy provided:

> This policy is also extended to insure against loss resulting from necessary interruption of business conducted by the Insured resulting from physical damage to off-premises utility and power stations ... furnishing electricity ... to Described Premises caused by physical damage of the type insured against.

█ Section 24 broadly extended the policy's business interruption coverages to include losses from power outages resulting from covered perils, without regard to whether the power outages also cause other physical property damage. But the extended coverage was limited to losses resulting from damage to off-premises power stations "furnishing electricity ... to Described Premises." Though the portion of the policy defining Described Premises was not included in the record on appeal, Pentair's reply brief conceded that the term does not include "Pentair's suppliers." Thus, if the earthquake had damaged a substation directly servicing Pentair, any resulting business interruption losses would be covered by Section 24. But Section 24 did not broaden the contingent business interruption coverage of Section 10(h)(2) because Section 24 was limited to power outages at "Described Premises." We may not assume that this

limitation was inadvertent. It is one thing to insure all risk of power outage losses at known, identified Pentair facilities caused by covered damage to off-premises power suppliers. Extending that coverage to Pentair losses resulting from power outages at unknown third party supplier premises, which may be located all over the world, insures a different and presumably more substantial risk.

For the foregoing reasons, we conclude that the contingent business interruption loss in question was not covered either by Section 24, the policy provision explicitly dealing with damage to off-premises power suppliers, or by the plain meaning of Section 10(h)(2) and Section 11 as construed by the district court. Accordingly, the judgment of the district court is affirmed.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. I am persuaded by Pentair's argument that the Taiwanese factory suppliers suffered direct physical loss when power outages rendered them unable to perform their intended function of manufacturing products for Pentair. *See Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300–01 (Minn.Ct. App.1997); *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn.Ct.App.2001); and *Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*, No. 97–2185, 2002 WL 31185884 at *3 (D.Minn. Sept.27, 2002), *aff'd*, 356 F.3d 850 (8th Cir.2004). As the issues are state law issues, I see little reason for further extended discussion in this dissent.