# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1256
_____

Olmsted Medical Center

*Plaintiff - Appellant*

v.

Continental Casualty Company

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 18, 2022
Filed: April 26, 2023
_____

Before LOKEN, GRUENDER, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

This case presents the question of whether allegations of the presence of the virus that causes COVID-19, combined with compliance with the related health-and-safety regulations and executive orders, is sufficient to state a claim for a "physical

loss" of property under an insurance policy governed by Minnesota law. The district court[1] held that such allegations were insufficient. We affirm.

## I. Background

Olmsted Medical Center ("Olmsted") provides preventive, primary, and specialty healthcare in southeastern Minnesota. Olmsted purchased a business property insurance policy from Continental Casualty Company ("Continental") for the period from January 1, 2020 to January 1, 2021. The "Coverage" section of the policy states that it "insures against risks of direct physical loss of or damage to property and/or interests described herein at" Olmsted's premises.

In March 2020, Minnesota Governor Tim Walz issued Executive Order 20-01, declaring a peacetime emergency due to the threat posed by the COVID-19 pandemic. Later that month, Governor Walz issued Executive Order 20-09, which ordered non-essential or elective surgeries and procedures that used personal protective equipment or ventilators to be indefinitely postponed. Olmsted estimates sixty percent of the surgeries or procedures performed at its locations are non-essential or elective and that it suffered losses in excess of $19 million due to COVID-19 and Executive Order 20-09.

In May 2020, Olmsted submitted a claim for losses it sustained due to the COVID-19 pandemic under the insurance policy it held with Continental. Continental denied the claim two days later. Olmsted filed suit in Minnesota state court, alleging Continental breached the insurance contract when it refused to pay the claim. Olmsted requested damages and declaratory relief. Continental removed the action to federal court based on diversity jurisdiction, and Olmsted filed an amended complaint with the same causes of action.

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

In the amended complaint, Olmsted alleged that the "SARS-CoV-2 virus was physically present" at its premises; that there were confirmed COVID-19 cases within the facility starting in July 2020;[2] and that from the spring of 2020 through June 2021, at least 129 Olmsted employees, eighty-two patients, and thirty-six individuals in the facility tested positive for COVID-19. In addition, Olmsted alleged that COVID-19 was "pervasive" in the community, with 4,800 community members testing positive for COVID-19 at Olmsted's community testing site, which was near its location, during the same time period.

Olmsted also alleged "SARS-CoV-2 can live on surfaces and materials anywhere from a few hours to multiple days." In addition, "[i]f any contaminated spot is missed during routine cleaning procedures, the virus will continue to survive and possibly spread until it is contained." Olmsted alleged it canceled or postponed about fifty percent of its surgeries and procedures, and that "patients who previously schedule[d] non-essential or elective surgeries and procedures" and those who wanted to, could not be treated at Olmsted. Olmsted alleged these cancellations and postponements were "a result of the existence of COVID-19 and the attendant SARS-CoV-2 virus, Executive Order 20-09, and the required quarantine and isolation protocols." In Olmsted's view, "[b]ecause of the pervasive nature of the positive tests, it would have been impossible for Olmsted Medical to continuously clean and disinfect the facility in order to safely allow all of these procedures to occur."

There are four provisions of the property insurance policy that are relevant to this appeal. They are the business-interruption, contingent-business interruption, civil-authority, and ingress-egress provisions. The business-interruption provision "covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property . . . ." The contingent-business interruption provision covers loss "resulting from necessary interruption of business

---

[2]We acknowledge Olmsted's appellate brief noted an exhibit attached to the amended complaint showing the first confirmed case of COVID-19 at Olmsted may have been as early as May 25, 2020.

conducted by the Insured at [Olmsted's premises], caused by perils insured against that result in direct physical loss or damage to" the property of certain specified third parties. The civil-authority provision covers losses "during the period of time while access to [Olmsted's premises] is prohibited by order of civil authority, but only when such order is given as a direct result of physical loss or damage to property . . . occurring at or in the immediate vicinity of" Olmsted's premises. The ingress-egress provision covers losses "during the period of time when as a direct result of physical loss or damage to property . . . ingress to or egress from [Olmsted's premises] is thereby physically prevented."

After Olmsted filed its amended complaint, Continental filed a motion to dismiss. Continental argued, among other things, that Olmsted's allegations did not implicate a "direct physical loss of or damage to" property; therefore, its claim for coverage did not fall within the policy's language under any of the above provisions. The district court agreed, as do we.

## II. Analysis

We review the district court's decision to grant a Rule 12(b)(6) motion to dismiss de novo. *Rock Dental Ark. PLLC v. Cincinnati Ins. Co.*, 40 F.4th 868, 870 (8th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"Because we are a federal court sitting in diversity, we apply the substantive law of the forum state." *Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014). When applying the substantive law of the forum state, we must follow decisions of the state's supreme court interpreting the forum's law. *See Brill as Tr. for Brill v. Mid-Century Ins. Co.*, 965 F.3d 656, 659 (8th Cir. 2020). However, if a

-4-

state's supreme court "has not spoken on an issue, we must predict how it would decide the issue." *Id.* To make this prediction, we "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Id.* (quoting *Integrity Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 917 (8th Cir. 2008)). The parties agree Minnesota law governs this case.

Olmsted alleges Continental breached the insurance contract by failing to pay Olmsted's claim. In Minnesota, "[i]nterpretation of an insurance policy, and whether a policy provides coverage in a particular situation, are questions of law that we review de novo." *Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 687 (Minn. 2018) (quoting *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013)). In addition, "the insured bears the initial burden of demonstrating coverage" under the policy. *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) (quoting *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006)).

Minnesota courts "interpret insurance policies using the general principles of contract law." *Id*. To "determine whether an insurance policy provides coverage" under Minnesota law, we begin "by looking at the language of the insurance policy itself." *Dollansky*, 919 N.W.2d at 691. The goal is to "ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract." *Wolters*, 831 N.W.2d at 636 (quoting *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997)). "Provisions in an insurance policy are to be interpreted according to both plain, ordinary sense and what a reasonable person in the position of the insured would have understood the words to mean." *Id.* (internal quotation marks omitted).

Olmsted's claim for insurance coverage stems from policy language covering certain losses caused by "direct physical loss of or damage to covered property." We have previously held under Minnesota law that "loss of use or function" alone is not sufficient to establish "direct physical loss or damage." *See Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613, 616 (8th Cir. 2005). In *Pentair*, we

considered whether a factory that experienced electrical power outages had suffered "direct physical loss or damage." The district court found the plaintiff did not "prove coverage because the power outages caused no injury to the Taiwanese factories other than a shutdown of manufacturing operations." *Id.* On appeal, the plaintiff argued the "inability to function after the loss of power" satisfied the policy's language. *Id.* We disagreed because accepting the argument would lead to the conclusion that "direct physical loss or damage is established *whenever* property cannot be used for its intended purpose." *Id.* We did not believe the Minnesota Supreme Court would endorse such a broad reading of its caselaw. *See id.* (citing *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 297 (Minn. 1959), and *Rest Assured, Inc. v. Am. Motorist Ins. Co.*, No. C9-98-2302, 1999 WL 431112 (Minn. Ct. App. June 29, 1999) (unpublished)). We held that, "although electric power has a 'physical' element, the district court's construction [was] consistent with the plain language of . . . the policy." *Pentair*, 400 F.3d at 616.

Our decision in *Pentair* recently played a role in a case similar to this one, albeit under Iowa law. In *Oral Surgeons, P.C. v. Cincinnati Insurance Co.*, 2 F.4th 1141, 1143 (8th Cir. 2021), we considered language in an insurance contract that covered "accidental physical loss or accidental physical damage." We reiterated our *Pentair* conclusion that the adjective "physical" meant the policy could not "reasonably be interpreted to cover mere loss of use when the insured's property has suffered no physical loss or damage." *Id*. at 1144 (citing *Pentair*, 400 F.3d at 616). In other words, "there must be some physicality to the loss or damage of property— *e.g.*, a physical alteration, physical contamination, or physical destruction." *Id.* We concluded that when the insured had "pleaded generally that [it] suspended non-emergency procedures due to the COVID-19 pandemic and the related government-imposed restrictions," it had not pleaded the physical alteration necessary to support a physical loss or physical damage, "regardless of the precise definitions of the terms 'loss' or 'damage.'" *Id.* at 1145.

Olmsted's theory relies on the idea that a "physical contamination" can satisfy the "physicality" requirement we described in *Oral Surgeons*. Olmsted argues it has

suffered a "physical loss" because its property was contaminated by SARS-CoV-2 and it complied with the physical distancing, quarantining, and isolation regulations imposed by the governor's executive order. It is true that some forms of physical contamination may support a finding of "direct physical loss." *See Torgerson Props., Inc. v. Cont'l Cas. Co.*, 38 F.4th 4, 6 (8th Cir. 2022) ("Contamination . . . is a direct physical loss; blanket shutdown orders are not."). But neither we nor the Minnesota Supreme Court have ever held SARS-CoV-2 is the kind of contaminant that results in a "direct physical loss." *See Lindenwood Female Coll. v. Zurich Am. Ins. Co.*, 61 F.4th 572, 574 (8th Cir. 2023) (observing, "we have not held that allegations of the virus's presence, standing alone, satisfy the *Oral Surgeons* standard"). We reach that question today, make the appropriate "*Erie*-educated guess," *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010), and hold that it is not.

As we indicated in *Oral Surgeons*, a plaintiff must allege a "physicality" to the loss. *See* 2 F.4th at 1145. Even if we assume some forms of contamination may have a physical effect on property to support a finding of "physical loss," Olmsted has not alleged SARS-CoV-2 had *any* effect on its property. Olmsted acknowledged in its complaint that, while SARS-CoV-2 can live on surfaces, contaminated property will return to a non-contaminated state with no intervention because the virus may die on its own in as little as a few hours. This is consistent with the district court's observation that the virus can also be eliminated by "routine cleaning procedures" and disinfectant. In the end, although SARS-CoV-2 may have a "physical" element, *see Pentair*, 400 F.3d at 616, it does not have a physical effect on real or personal property. *See Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1275 (Mass. 2022) ("[T]he question is not whether the virus is physical, but rather if it has direct physical effect *on property* that can be fairly characterized as "loss or damage."). Admittedly, the presence of SARS-CoV-2 may ultimately result in a loss of use because of the danger the virus poses to human health, but we have already found mere loss of use is not a "direct physical loss" in this type of insurance policy under Minnesota law. *See Pentair*, 400 F.3d at 616.

To defend its complaint, Olmsted first turns to three Minnesota cases: *Marshall Produce Co. v. St. Paul Fire and Marine Insurance Co.*, 98 N.W.2d 280 (Minn. 1959); *General Mills, Inc. v. Gold Medal Insurance Co.*, 622 N.W.2d 147 (Minn. Ct. App. 2001); and *Sentinel Management Co. v. New Hampshire Insurance Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997). Olmsted argues that these cases show Minnesota has broadly interpreted "direct physical loss" and "direct physical damage." These cases do not alter our conclusion.

We begin with *Marshall Produce* because decisions by the Minnesota Supreme Court are binding. *See Mid-Century Ins.*, 965 F.3d at 659. In *Marshall Produce*, the Minnesota Supreme Court considered policies that insured property "against all loss or damage by fire." 98 N.W.2d at 285 (emphasis omitted). Certain food products stored in the plaintiff's facility were exposed to smoke from a nearby fire. *Id.* at 285–86. The government—the party that had previously contracted to purchase the food products—subsequently rejected them under its purchase contract which required the facility to be free of "smoke-laden air." *Id.* at 284–86 (emphasis omitted). The court addressed the question of whether a loss in value would sustain a finding of "loss or damage" when there was no physical damage to the merchandise itself. *Id.* at 287. The court held, "[i]t was not necessary that plaintiff's merchandise be intrinsically damaged so long as its value was impaired . . . ." *Id.* at 293.

*Marshall Produce* provides little guidance for interpreting the insurance contract in this case because the language of the policies is markedly different. In *Marshall Produce*, the Minnesota Supreme Court considered whether "all loss or damage" required physical damage to the merchandise. Here, the policy states that it covers "direct *physical* loss of or damage to covered property." The explicit requirement that the loss be "physical" demonstrates the contract language in this case means something different than the contract in *Marshall Produce*. *Cf. Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834, 837 (8th Cir. 2006) (distinguishing *Marshall Produce* on the grounds that the policy covered "all loss or damage by fire," and the relevant policy covered only "direct physical loss to property"). And as we have previously observed, nothing in *Marshall Produce*

suggests the Minnesota Supreme Court would endorse the mere loss of use as a "physical loss." *Pentair*, 400 F.3d at 616.

Next, we turn to *General Mills* and *Sentinel Management*—more recent cases decided by the Minnesota Court of Appeals. Although decisions by a state's intermediate court are not binding on us, they are not without value. "[W]e follow decisions of the intermediate state court when they are the best evidence of [Minnesota] law." *Spagna v. Phi Kappa Psi, Inc.*, 30 F.4th 710, 716 (8th Cir. 2022) (quoting *Netherlands Ins. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014)). Neither *General Mills* nor *Sentinel Management* persuade us the Minnesota Supreme Court would conclude the presence of SARS-CoV-2 constitutes a "direct physical loss" of property.

The Minnesota Court of Appeals concluded in these cases that "direct physical loss" extended to certain contaminants. In *General Mills*, the Minnesota Court of Appeals considered whether the policy applied when oats were treated with a non-FDA approved pesticide, all machinery "had to be disassembled, cleaned, and reassembled" to remove the traces of the unapproved pesticide, and all products contaminated by the unapproved pesticide were discarded because they were "adulterated" under FDA regulations. 622 N.W.2d at 150–51. In *Sentinel Management*, the Minnesota Court of Appeals considered whether the policy applied when a building contained released asbestos fibers, which is a known carcinogen. 563 N.W.2d at 298. While released asbestos fibers could be removed from surfaces, it appears that "abrasions from normal residential and building maintenance activities" would continue to cause asbestos fibers to be released until the asbestos-containing materials were replaced. *See id.*

*General Mills* and *Sentinel Management* are distinguishable from the present case. These cases dealt with forms of contamination that were permanent absent some intervention. Furthermore, they are more accurately described as fitting into the category of cases involving "property that became practically useless for anything." *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 404–05 (6th

Cir. 2021) (collecting cases); *see also Source Food*, 465 F.3d at 837 (observing that the product in *General Mills* was "rendered . . . unusable"). Indeed, in *Sentinel Management*, the court suggested the standard "direct physical loss" to property may be met when "a building's function [is] seriously impaired or destroyed and the property rendered useless by the presence of contaminants." 563 N.W.2d at 300. Rather than being permanent, a SARS-CoV-2 contamination is surface-level, removed with relative ease, and will dissipate on its own in a matter of days, if not sooner. And although Olmsted had to cancel or postpone elective and non-essential surgeries and procedures, Olmsted continued to function as a healthcare provider throughout the COVID-19 pandemic.

Olmsted's second argument is that a conclusion in its favor is compelled by the distinction between physical loss "of" property and physical loss "to" property. To support this claim, Olmsted points to our decision in *Source Food.* In that case, we decided whether there was a "direct physical loss to Property" under an insurance contract governed by Minnesota law. *Source Food*, 465 F.3d at 835–36 (emphasis omitted). We held the policy language was not satisfied when the plaintiff's uncontaminated beef product could not be shipped across the United States and Canada border due to a United States Department of Agriculture embargo. *Id.* at 838. We further explained the plaintiff's "argument might be stronger if the policy's language included the word 'of' rather than 'to,' as in 'direct physical loss *of* property' or even 'direct loss *of* property.'" *Id.*

In spite of that observation in *Source Food*, we are not persuaded by Olmsted's reliance on the distinction between "of" and "to" in this case. The Minnesota Supreme Court has rejected "a process of dissection" in contract interpretation, and instead opts for "a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003) (cleaned up). Reading the contract as a whole closes the door on Olmsted's argument.

The only policy provision Olmsted relies on that has the word "of" is the business-interruption provision. That provision uses the phrase "direct physical loss *of* or damage to" property, while the other relevant provisions use the phrase "direct physical loss or damage *to*" property. (Emphasis added). The business-interruption provision, however, expressly limits coverage to the "length of time as would be required . . . to rebuild, repair or replace" the affected property. Due to the fact SARS-CoV-2 does not have an effect on the underlying property, we do not see how to square Olmsted's broader interpretation of the provision with the express time limitation. *See Oral Surgeons*, 2 F.4th at 1144 ("That the policy provides coverage until property 'should be repaired, rebuilt or replaced' or until business resumes elsewhere assumes physical alteration of the property, not mere loss of use.").

For all the reasons explained above, Olmsted's claims for breach of contract and declaratory judgment do not state claims for relief that are plausible, and the district court correctly dismissed Olmsted's complaint.

### III. Conclusion

The judgment of the district court is affirmed.

_____